C

Exh. C

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| ELLEN GAYLE MOORE, Fannie | ) Civil Action No. CV-99-BE-3262-S |
| McConnell (on behalf of herself and as | ) |
| | ) CLASS ACTION |
| beneficiary for the Liberty National Life | ) |
| Insurance Policies owned by Spencer | ) SECOND AMENDED CLASS |
| | ) ACTION COMPLAINT |
| Williams, who is now deceased) and | ) |
| Anita Bowers, On Behalf of Themselves | ) |
| and All Others Similarly Situated, | ) |
| | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) |
| LIBERTY NATIONAL LIFE | ) |
| INSURANCE COMPANY, | ) |
| | ) |
| Defendant. | ) |

4.     Because Liberty National resides and conducts business in this district and because a substantial part of the events, omissions and conduct giving rise to the claim occurred in this district, venue is proper in this district and this division. Federal jurisdiction exists pursuant to 28 U.S.C. §1331 as to Plaintiffs' claims of race discrimination in violation of 42 U.S.C. §§1981 and 1982.   The Court has supplemental jurisdiction of all remaining claims pursuant to §1367.

## II.   NATURE OF THE CASE

5.     This is a class action seeking redress for a nationwide scheme and common course of conduct involving racial discrimination, fraudulent concealment, unconscionable conduct and breach of contract by Liberty National relating to the marketing, sale and administration of so-called "industrial life" insurance policies. As used in this Complaint, the terms "Policies," "Industrial Policies," "Industrial Insurance" and "Industrial Life Insurance" refer to and shall mean any life insurance policy underwritten and/or issued by Liberty National that is marked, stamped or otherwise referred to (either expressly or commonly) as "industrial," "debit," "burial," "funeral" or "home service" insurance or otherwise expressly categorized as "industrial," "debit," "burial," "funeral" or "home service" insurance by statute in those states where Liberty National markets policies and includes all life insurance policies and health and accident policies which include an accidental death benefit, with a face amount of $25,000 or less. These terms also include all ordinary and Monthly Debit Ordinary policies with a face amount of $10,000 or less. The definition is not limited to the statutory definition of industrial life insurance.  It includes but is not limited to insurance policies where premiums are or were collected on a home service or debit method.

6.     This action is brought by Plaintiffs as a class action on behalf of all African-American persons who have (or had at the time of the Policy's termination) an ownership interest (or beneficiary interest if a death benefit was paid or payable on the Policy) in one or more Industrial Policies issued by Liberty National, and whose

Policies were issued and administered based upon the nationwide unconscionable scheme and common course of conduct described herein and who were thereby harmed (the "Class" or "Class Members").

7.    Plaintiffs seek injunctive and equitable relief, punitive damages and other remedies for Liberty National's unlawful, unconscionable and racially discriminatory conduct described herein in connection with the training of its agents and the sale and administration of Industrial Life Insurance Policies to Plaintiffs and Class Members.

8.    For more than fifty years, Liberty National has maintained a discriminatory and unconscionable scheme in order to increase its own revenues and profitability to the detriment of Class Members, by implementing uniformly misleading, deceptive, unconscionable, and racially discriminatory sales and Policy administration practices. Liberty National instituted these practices *inter alia*, in order to compete with other insurance companies offering similar types of Policies.

9.    Industrial Life Insurance is a life insurance product with relatively low face value which is typically, although not always, less than $2,000, and premium payments which are intentionally designed to appear to the policyholder to be modest premium payments. These premium payments have been historically collected on a weekly or monthly basis by Liberty National sales agents.

10.    As part of its nationwide scheme, Liberty National targeted low income, impoverished, unsophisticated and minority segments of the population and marketed the Industrial Policies for sale to these consumers. In addition, on information and belief, for many years, Liberty National routinely, knowingly and intentionally caused Service to charge African-American individuals more for these Policies than Liberty National charged similarly situated Caucasian individuals. On information and belief, to the extent this discriminatory practice changed, African-Americans who purchased Industrial Policies before this discriminatory practice changed, continued to pay the same premiums which had been established under Liberty National's discriminatory pricing system. Liberty National also, as part of its routine practice and procedures,

prohibited its agents from selling ordinary life insurance policies to African-Americans. Liberty National was motivated by discriminatory intent and continues to discriminate against African-Americans in the manner set forth below.

11.    Liberty National constructed the Industrial Policies with small face value and charged weekly or monthly premiums often under $1.00. Liberty National has intentionally marketed these Policies through agents who are given exclusive territories, known as "debit routes." To effectuate the sale and administration of the Industrial Policies on a "debit" basis, Liberty National agents have been trained to personally visit the homes of Class Members residing on their routes to collect the premiums and develop a personal relationship with the Class Members that would facilitate the sale of additional Policies. Liberty National has trained its agents to market and sell certain of these Policies as "burial" protection to manipulate the emotions of prospective policyholders by instilling in, or playing to, a sense of shame in leaving their loved ones without funds to pay for a funeral at the time of their death.

12.    In designing, developing, marketing and selling these Policies, at all times Liberty National has known that it targeted a disadvantaged segment of the population which was unsophisticated with respect to insurance and related financial dealings or affairs and ill-equipped to understand the unfamiliar and technical language of the Policies, or the complex and sophisticated methods of determining premium payments. Liberty National has also known that the premiums appear small and affordable to Class Members, and that at the time of purchase the benefits totaled more than these disadvantaged individuals could conceive of saving in their lifetime. Liberty National has known, but has intentionally concealed from Class Members, what these targeted, unsophisticated Class Members did *not* know; that with respect to certain Policies, the small premiums would far exceed the face value of the Policies during the insureds' lifetime.

13.    Liberty National designed the Industrial Policies to create the illusion that they would provide valuable yet affordable benefits. In reality, the Policies are

- 4 -

unconscionable products which were calculated to generate tremendous profits for Liberty National with little attendant risk to Liberty National and little or no economic benefit for the unsuspecting and vulnerable Plaintiffs and Class Members. At the same time, although the premiums appeared small and affordable, the premiums are exorbitant in relation to the minimal benefits actually provided to Class Members. Further, Liberty National has known that, in the event of lapse for nonpayment of premium, Liberty National's practice is to conceal any cash value from its policyholders and to use any cash value to pay premiums until any and all Policy value is completely depleted.

14.    Given the design features of the Industrial Policies, Liberty National has known that virtually no transfer of risk to Liberty National has taken place. Liberty National also has known that to the extent that any risk was transferred, it was *de minimis* and would quickly dissipate over the life of the Policies. As Liberty National expected, the Company's profits have continued to expand and the *de minimis* risk, if any, has been quickly eliminated.

15.    Liberty National has trained, allowed or encouraged its agents to routinely sell Industrial Life Insurance products to Plaintiffs and Class Members when the Class Members' best interest would have been served, assuming a life insurance need existed, by traditional ordinary life insurance of similar face amounts.

16.    Liberty National has trained, directed and knowingly allowed its agents to sell multiple Policies where policyholders had no need for the insurance and where multiple Industrial Policies were used to reach a cumulative total of face amount which, in the best interest of the Plaintiffs and Class Members, could have been achieved through the use of ordinary policies of comparable value. Liberty National has had knowledge when multiple sales occurred through its established home office issuance procedures. Nevertheless, Liberty National has maintained this practice because of the excessive profitability of the Industrial Life Insurance products.

17.    Consistent with its effort to increase profits, Liberty National has

- 5 -

knowingly and intentionally set out to cut the administration costs associated with Industrial Policies even when doing so worked to the detriment of its African-American policyholders. Liberty National issued Industrial Policies which had, for many years, been serviced by agents on weekly debit routes. In furtherance of its plan to increase its profits and decrease its costs at the expense of African-American policyholders, Liberty National has terminated or modified the practice of weekly premium collection by debit agents throughout the country on in-force Industrial Life Policies. Liberty National has not reduced premium payments even though the costs associated with the weekly debit system were expense loaded into the premium at the time of Policy issuance and therefore has been unjustly enriched by this practice. This practice of weekly premium collection by agents was part of the course of dealing between the African-American policyholders and Liberty National.

18.    Liberty National Insurance Company has also systematically failed to pay death benefits that were due to Class members who were beneficiaries under the Industrial Policies. Liberty National has improperly reaped millions of dollars in premiums and unpaid death benefits by virtue of its fraudulent concealment and overreaching policy administration practices.

19.    Liberty National Insurance Company's plan, scheme and nationwide common course of conduct was designed to and did induce thousands of existing and prospective African-American policyholders to purchase Industrial Policies from Liberty National. Plaintiffs and Class Members have lost and/or face losing millions of dollars in premiums paid which exceed the face value of the Policies or which exceed a reasonable or appropriate total of premiums which should have been paid for their Policies, and are receiving reduced death benefits.

20.    The sales practices described herein have been successful for Liberty National. Liberty National has received millions of dollars of premium income on the Policies including millions of dollars of premiums which cumulatively exceed the reasonable or appropriate total of premiums which should have been paid for the

Industrial Policies.

21.    Insurance premiums constitute the consideration paid to an insurer for the issuance and delivery of a policy of insurance. Insurance premiums are determined by multiplication of the rate (or unit charge) to the measure of exposure or amount of insurance provided in an insurance policy.

22.    Rate-making is the process of establishing rates used in insurance to estimate the future costs associated with the transfer of risk. Insurance rates are established by actuaries employed by insurance companies, including Liberty National. Actuaries hold themselves out, and are held out by their employers, to be professionals charged with the duty to act in the public interest. The American Academy of Actuaries has adopted Actuarial Standards of Practice as well as a Code of Professional Conduct. The Preface to the Actuarial Standards of Practice provides that Actuaries are expected to provide counsel which is not only in the clients' interest but also in the interest of the public. Actuaries are to act in the public interest with "competence, integrity and objectivity of a high order."

23.    The premiums established and charged to the Plaintiffs and the Class by Liberty National for Industrial Insurance Policies are and were known by Liberty National to be racially discriminatory, excessive, unfair, unconscionable, unlawful and unreasonable. Liberty National's Industrial Insurance Policies were designed to and have yielded a rate of return on these insurance products for Liberty National which is unreasonable.

### III.    ACCRUAL, FRAUDULENT CONCEALMENT, CONTINUING VIOLATION AND EQUITABLE TOLLING

24.    Plaintiffs' claims did not accrue and the statute of limitations did not begin to run until the Plaintiffs knew or reasonably should have known that they were suffering injuries based upon unlawful discrimination. Plaintiffs and Class Members did not know and did not have reason to know that they were injured or that they were

being discriminated against until less than two years prior to the filing of the original complaint in this action. In addition, Plaintiffs' claims have accrued within the limitations period because Liberty National's violations are continuing.

25.    Furthermore, the statute of limitations has not run as to Plaintiffs' claims because the statute of limitations would be suspended due to Liberty National's fraudulent concealment of its discriminatory practices. The statute of limitations would also be tolled under the doctrine of equitable tolling.

26.    When Plaintiffs purchased their Policies, they were told that purchasing a given Policy would cost a specified amount. Plaintiffs were not shown rate books. Plaintiffs were not shown anything that would indicate the premiums paid by Caucasian policyholders. Plaintiffs were not told Caucasian policyholders paid lower premiums. Liberty National did not tell Plaintiffs that different rates existed for Caucasian policyholders. Plaintiffs were not shown any documents which would reveal that Caucasian policyholders paid lesser premiums for the same coverage. The logical inference from everything Liberty National told Plaintiffs was that all policyholders paid the same premiums for the same types of policies.

27.    Plaintiffs and Class Members were given no information that would have alerted them to Liberty National's discriminatory conduct with respect to premiums, cash values and death benefits, either at the point of sale or in later years. Plaintiffs and Class Members received no documents reflecting Liberty National's discriminatory premiums or other discriminatory practices. The Policies themselves do not reflect that African-Americans were charged higher premiums or that they would receive lower death benefits and cash values than similarly situated Caucasians, nor did they receive annual statements or any other documents which reflected Liberty National's ongoing and knowing discrimination. In fact, although Liberty National's sales agents used rate books reflecting Liberty National's discriminatory practices, the agents were trained to withhold this information from prospective African-American policyholders. Thus, the Liberty National rate books were neither disseminated nor

made available to Plaintiffs and Class Members.

28.    The decisions to sell to African-Americans, to discriminate on the basis of race and to conceal Liberty National's discriminatory practices were made in the 1930's or early 1940's.  Liberty National continues to act in accordance with and in furtherance of its discriminatory practices as set forth more fully herein.  Liberty National also continues its practice of fraudulently concealing its discriminatory practices.  Throughout this time period, Liberty National has refused to release or provide information about its knowing discrimination against Plaintiffs and Class Members in any way that the Plaintiffs and/or Class Members could have discovered the discrimination.   In fact, Liberty National has taken a number of actions to fraudulently conceal its discriminatory practices to insure that these practices were not discovered.  This fraudulent concealment permits the Plaintiffs to bring federal claims on behalf of persons who were harmed by defendant more than two years prior to the filing of this lawsuit.  Although the initial decisions to discriminate and to conceal were made in the 1930's, or early 1940's, Liberty National has repeatedly made the decision throughout the time period to continue the concealment of its discriminatory practices and has acted in accordance with this decision.

29.    Liberty National ensured that Plaintiffs could not and would not, through the exercise of due diligence, discover Liberty National's unlawful discriminatory conduct due to the undisclosed and indecipherable manner in which the Policies were designed and priced by Liberty National.

30.    Beginning in or about 1941, the insurance industry constructed mortality tables which used race as a factor to discriminate against African-Americans, who had been disadvantaged by discriminatory socio-economic conditions.

31.    The insurance industry employed these mortality tables as a pretext to charge higher premiums and to pay comparatively lower cash values and death benefits to African-Americans, as compared to Caucasian policyholders.

32.    These mortality tables were not disseminated or otherwise made available

- 9 -

to African-Americans who were disadvantaged by the tables.

33.    The discriminatory mortality assumptions, in turn, were deliberately embedded in the pricing and policy design assumptions by Liberty National and other insurance companies. Nowhere on the face of Policy documents provided to African-American policyholders does *any* information appear which would reveal that the premium charged was based upon racially discriminatory rates.

34.    The unknown and inherently unknowable nature of Liberty National's discriminatory pricing and Policy benefit determinations was exacerbated by the premium rate structure adopted by Liberty National. The premium rate quoted and charged to any particular policyholder was dependant on a number of undisclosed rating factors, including, for example, attained age, policy type and the face amount of coverage.

35.    Thus, as a practical reality, it was impossible for African-Americans who purchased a Policy from Liberty National to compare their effective premium rate with the premiums charged to similarly situated Caucasian policyholders. Consequently, even if Plaintiffs or other Class Members had reason to inquire or investigate, they would not and could not have discovered that they were sustaining injuries from unlawful, discriminatory conduct by Liberty National. Moreover, as Liberty National is aware African-American policyholders would not, and did not, learn the rates being charged to Caucasian policyholders were lower for the same amount of insurance.

36.    The same is true with respect to cash values and death benefits. The inherently undiscoverable nature of Liberty National's discriminatory conduct was further hidden from Plaintiffs and the Class by Liberty National's affirmative efforts to conceal its unlawful conduct through pretextual and misleading premium rates and its other acts of fraudulent concealment, as alleged below.

37.    Liberty National, its affiliates and the companies for which Liberty National is now responsible engaged in a concerted and continuous course of conduct

that was intended to fraudulently conceal their unlawful discriminatory practices from Plaintiffs and the Class.

38.    Internally, Liberty National acknowledged its discriminatory policies, classifying African-American policyholders charged higher premiums as "Negro" risks as opposed to Caucasian policyholders, who were termed "white" risks. In its dealings with African-Americans, however, Liberty National concocted an elaborate and pretextual premium rating structure to disguise and conceal from Plaintiffs and the Class the fact that they were being charged racially discriminatory premiums.

39.    In the rate books disseminated by Liberty National to its field sales force, the rates for African-Americans were pretextually referred to as "standard" rates, while the rates for Caucasians were referred to as "preferred" rates.

40.    Liberty National trained its agents to sell Policies to African-Americans using the more expensive, discriminatory premiums and trained its agents not to disclose to African-American policyholders that the premiums were discriminatory. Liberty National's sales force was trained to tell potential African-American customers, and in fact did tell them on a systematic basis, that they were receiving the "standard" rates. The logical inference was that the African-Americans were not being discriminated against. In fact, African-Americans were actually being charged a higher, discriminatory rate.

41.    By design, African-Americans were misled so as to believe that they were paying the same "standard" non-discriminatory rates as Caucasian policyholders. The sales force did not tell African-American customers that the "preferred" rate was for white customers only.

42.    This practice began in the 1930's, or early 1940's and continued at least until the mid-1970's. Liberty National either knew or reasonably should have known that Plaintiffs and Class Members would not learn about the discrimination. The nature of society was and is such that African-Americans generally would not learn the more favorable rates that were being charged to Caucasians. Liberty National

refused to release or provide information about its discrimination against Plaintiffs and the Class in any way that the Plaintiffs and/or Class Members could have discovered the discrimination.

43.    To maximize its discriminatory sales to African-Americans, Liberty National adopted a distribution system which created economic incentives for its sales agents to prey on the African-American community.

44.    Liberty National sales agents were assigned "debit" routes confined to predominantly African-American communities and neighborhoods.

45.    Likewise, Liberty National agents were authorized or encouraged to sell higher priced, poorly performing Industrial Policies to African-Americans and were prevented or discouraged from selling to African-Americans other available products that would provide better benefits for lower premiums.

46.    Liberty National adopted a compensation system which rewarded sales agents economically for discriminatory sales to African-Americans. Liberty National agents were paid commissions based on the premium amount of insurance that they sold. Thus, Liberty National agents profited to the extent they sold higher-priced inferior policies to African-Americans. In the compensation plan for agents who sold its policies, Liberty National created incentives for the agents to disclose only those facts that would encourage sales of insurance. Liberty National itself, like its agents, also benefitted from increased sales to African-Americans of higher-priced inferior insurance policies. Disclosure of the fact that Plaintiffs and the Class had been the victims of discrimination would have reduced sales or required Liberty National to lower premiums or provide increased benefits to African-Americans, thereby reducing Liberty National's profits.

47.    Therefore, as a result of the sales system and incentives that Liberty National created, the unlawful, racially discriminatory practices outlined herein were intentionally concealed from Plaintiffs and the Class.

48.    Beginning at least in the 1930's, or early 1940's and continuing today or

until very recently, Liberty National employed underwriting or rating classifications as a clandestine means to discriminate against African-Americans. Liberty National developed underwriting criteria which appeared to be racially neutral but which were, in reality, employed as a pretext to continue discrimination against African-Americans. For example, Liberty National specified certain occupations (such as janitors, maids and "bootblacks") that were predominantly held by African-Americans and used other underwriting criteria (such as undesirable residential neighborhoods, immoral behavior, or undesirable personal traits) to justify Liberty National's continued practice of charging African-Americans higher premiums for inferior policies. These pretextual standards created the appearance of racially neutral underwriting when, in fact, they were used as tools to continue and conceal Liberty National's discriminatory conduct. Similarly, Liberty National replaced its older Industrial Policies with new products, such as so-called "monthly debit ordinary" or "MDO" policies to continue and to conceal Liberty National's ongoing unlawful discrimination.

49.     Plaintiffs and Class Members could not reasonably discover the discriminatory premiums and did not do so until less than two years before the filing of the lawsuit. Statements or actions undertaken by Liberty National to obscure the claims of the Plaintiffs and the Class included training Liberty National's sales agents, directly or indirectly, not to tell Plaintiffs and the Class about Liberty National's discriminatory practices and conduct.

50.     Plaintiffs and the Class were misled into believing that they were being charged standard, nondiscriminatory rates, and none of the Plaintiffs or Class Members learned about the discrimination until less than two years before the filing of this lawsuit. In fact, they did not learn about the discrimination until a very short time before the lawsuit was filed. For the reasons alleged above, the vast majority of Class Members still do not know that they have been and continue to be injured by Liberty National's discriminatory conduct. Therefore, the limitations period has not

- 13 -

possibly run on the Plaintiffs and Class Members. Much of the information about all of the matters pleaded in this section is in the sole possession of Liberty National. Based upon information and belief, the Plaintiffs allege that discovery will lead to more detailed and particular information relating to the matters alleged herein and to Liberty National's practices of fraudulent concealment.

51.    As a practical matter, no Plaintiff or Class Member could have discovered Liberty National's discriminatory conduct. Since Liberty National began selling to African-Americans, the Company instructed its agents not to inform African-American policyholders of the discriminatory rates. Liberty National and its agents knew that disclosing such information would result in the sale of fewer policies to African-Americans. Since Liberty National initially began selling to African-Americans and continuing until the mid-1970's, Liberty National instructed its agents that they were not allowed to sell better policies to African-American customers. One of the ways that Liberty National concealed the discrimination from Plaintiffs and the Class was that Liberty National effectively trained its agents not to share or show full rate books to customers. At most, the agents would show only the rate that was being charged to the person buying the policy, and the rate book said that it was a standard rate, leading Plaintiffs and Class Members to believe that they were not being discriminated against. The Plaintiffs allege that this practice continues today. Liberty National further concealed its discriminatory practices by changing the name of its product from Industrial Life to monthly debit ordinary life insurance. In reality, no consumer could or can discover Liberty National's racial discrimination, given the way premiums are set. Absent disclosure by Liberty National or its agents, Plaintiffs and Class Members could not discover that they were being discriminated against. Liberty National did not make such disclosures. Instead, Liberty National actively concealed its discriminatory conduct.

52.    In addition, the limitations period has not run because Liberty National's discriminatory conduct is continuing in nature. Liberty National continues to charge

and accept discriminatory premiums from various Plaintiffs and Class Members. For example, Plaintiff McConnell is still paying premiums on Policy #15153077, attached as Exhibit D. She is paying twelve cents per week because she is African-American, and if she were Caucasian, she would be paying ten cents per week for this $2,000 policy. Deceased plaintiff Williams was paying premiums of 35 cents per week because he was African-American, and if he had been Caucasian, he would have paid 30 cents per week. His beneficiary, plaintiff McConnell, should receive a higher death benefit in the amount of insurance equal to what a Caucasian would have received for the same premium. Plaintiff Bowers is still paying premiums at a higher rate because she is African American.

53.     Even with respect to "paid up" policies, there are "cash values" which Liberty National adjusts each year. Liberty National continues to discriminate against each Plaintiff and Class Member when it adjusts the cash values of the Policies, including within two years of the filing of the complaint. In fact, the difference in cash values for Policies sold to African- Americans as compared to Policies sold to Caucasians continues to increase each year.

54.     There is a substantial nexus between the acts of discrimination within the two years of filing suit and the acts of discrimination prior to that time. The acts involve the same type of discrimination. The acts are recurring and not isolated.

55.     However, the acts of discrimination did not trigger the awareness of the Plaintiffs or the Class Members to assert their rights, because, among other things, there was no reasonable way for the Plaintiffs or the Class Members to learn that they were being discriminated against, and they did not learn of the discrimination.

56.     Finally, Liberty National is equitably estopped from raising the statute of limitations. The equitable tolling is justified based upon the matters alleged throughout this complaint including the matters set forth above in this section.

57.     Plaintiffs and Class Members have acted with reasonably prudent regard with respect to their rights. The facts which support the Plaintiffs' causes of action

were not apparent to the Plaintiffs or the Class Members. The practicalities of the situation justify any delay in the filing of the claims in this action.

## IV.  FACTUAL ALLEGATIONS

58.    Plaintiffs are residents of Collinsville, DeKalb County, Alabama. Ms. Moore is a 51 year old African-American who was charged a discriminatory premium on her life insurance Policy. Ms. McConnell is a 74 year old African-American who was charged a discriminatory premium on her insurance Policies. Mr. Williams is a deceased African-American who was charged a discriminatory premium on his insurance Policies. Ms. Bowers is a 45 year old African-American who was charged a discriminatory premium on her insurance Policies.

***Ellen Gayle Moore***

59.    Ms. Moore is a member of the Class defined above.

60.    Ellen Gayle Moore is a resident of Collinsville, DeKalb County, Alabama. Ms. Moore is an African-American who was charged a premium that Liberty National knew to be racially discriminatory on her life insurance Policy, and was also discriminated against as a result of Liberty National's practices alleged above.

61.    On November 15, 1954, Ms. Moore became the insured on an Industrial Life Insurance Policy #929921 which was issued by Service and is attached as Exhibit "A."

62.    Ms. Moore paid her premiums based upon a racially discriminatory premium rate and as a result paid more for her Policy than similarly situated Caucasian individuals would pay.

***Fannie McConnell***

63.    Ms. McConnell is a member of the Class defined above.

64.    On April 5, 1965, Ms. McConnell became the insured on an Industrial Insurance Policy #2341927 issued by Service which is attached as Exhibit "B." On November 24, 1969, Ms. McConnell became the insured on an Industrial Insurance Policy #14758551, which was issued by Service and is attached as Exhibit "C." On

June 25, 1970, Ms McConnell became the insured on an Industrial Insurance Policy #15153077, which was issued by Liberty National and is attached as Exhibit "D." On May 13, 1974, Ms. McConnell became the insured on an Industrial Insurance Policy #21460692, which was issued by Liberty National Life Insurance Company and attached as Exhibit "E."

65.    Ms. McConnell paid and is paying her premiums based upon a premium rate that Liberty National knew to be racially discriminatory and as a result paid more for her Policy than similarly situated Caucasian individuals would pay. Ms. McConnell was also discriminated against as a result of Liberty National's discriminatory practices outlined above.

66.    The premiums on the policies were established based upon a weekly debit collection system. The costs associated with this system were loaded into the premiums at the time of issuance. Despite Liberty National's termination of the weekly debit collection system, Liberty National continued to collect the same premium amounts.

**Fannie McConnell (as Beneficiary Under the Policy Owned by Spencer Williams)**

67.    Fannie McConnell is a member of the Class defined above by virtue of being the beneficiary to death claims paid on Liberty National Policies formerly owned by deceased plaintiff Spencer Williams.

68.    On April 5, 1965, Mr. Williams became the insured on an Industrial Insurance Policy #2341929, which was issued by Service and is attached as Exhibit "F." On November 24, 1969, Mr. Williams became the insured on an Industrial Insurance Policy #14758553, which was issued by Service and is attached as Exhibit "G." On August 18, 1975, Mr. Williams became the insured on an Industrial Insurance Policy #22289217, which was issued by Liberty National Life Insurance Company and is attached as Exhibit "H."

69.    Mr. Williams paid his premiums based upon a premium rate that Liberty National knew to be racially discriminatory and as a result paid more for his Policy

- 17 -

than similarly situated Caucasian individuals would pay. He continued to pay such discriminatory premiums until his death in 2001. Because Mr. Williams paid inflated discriminatory premiums on his Policies, he should have received a higher death benefit than what was paid to the beneficiary, Fannie McConnell. Thus, Fannie McConnell has been harmed as a result of Liberty National's discriminatory conduct. In addition, Mr. Williams was discriminated against as a result of Liberty National's discriminatory practices alleged above.

### Anita Bowers

70.    Ms. Bowers is a member of the Class defined above.

71.    On April 5, 1965, Ms. Bowers became the insured on an Industrial Insurance Policy #2341930, which was issued by Service Insurance Company of Alabama and is attached as Exhibit "I." On November 24, 1969, Ms. Bowers became the insured on an Industrial Insurance Policy #14758555, which was issued by Service and is attached as Exhibit "J." On August 11, 1975, Ms. Bowers became the insured on an Industrial Insurance Policy #22275736, which was issued by Liberty National and is attached as Exhibit "K."

72.    The premiums on the policies were established based upon a weekly debit collection system. The costs associated with this system were loaded into the premiums at the time of issuance. Despite Liberty National's termination of the weekly debit collection system, Liberty National continued to collect the same premium amounts.

73.    Ms. Bowers paid and continues to pay her premiums based upon a premium rate that Liberty National knew to be racially discriminatory and as a result paid more for her Policy than similarly situated Caucasian individuals would pay. In addition, Ms. Bowers was discriminated against as a result of Liberty National's discriminatory practices alleged above.

74.    The premiums on the Policies were established based upon a weekly debit collection system. The costs associated with this system were loaded into the

- 18 -

premiums at the time of issuance. Despite Liberty National's termination of the weekly debit collection system, Liberty National continued to collect the same premium amounts.

## V.  CLASS ACTION ALLEGATIONS

75.    This case is brought as a class action under Fed. R. Civ. P. Rule 23(a), and (b)(2). Alternatively, plaintiffs seek certification under Fed. R. Civ. P. 23(b)(1). Plaintiffs seek certification of this action as a class action on behalf of all African-American persons who have (or had at the time of the Policy's termination), an ownership interest (or beneficiary interest if a death benefit was paid or payable on the Policy) in one or more Industrial Life Insurance Policies issued, serviced, administered or purchased from Liberty National, and who were harmed by the conduct alleged herein (the "Class"). This case is properly brought as a class action under Rule 23, for the reasons set forth in the following paragraphs.

76.    Certification under Rule 23(b)(2) is appropriate because plaintiffs seek equitable relief, including injunctive relief, declaratory relief, restitution and punitive damages incidental to, or flowing from, such relief, for the entire Class. For plaintiffs' punitive damages claim, plaintiffs alternatively seek certification under Rule (b)(1) to ensure appropriate punishment and deterrence of future misconduct while freeing Liberty National from possibly repetitive awards exceeding limitations imposed by due process.

77.    Membership in the Class is so numerous that separate joinder of each member is impracticable. The number of Class Members is unknown but can be easily determined from the records of Liberty National. Plaintiffs believe that there are thousands of persons in the Class. Although Plaintiffs do not presently know the names of all Class Members, their identities and addresses can be readily ascertained from Liberty National's records.

78.    The named Plaintiffs are members of the Class of victims described herein. They were subject to a common course of conduct by Liberty National and

purchased Industrial Life Insurance from Liberty National based upon the discriminatory sales and policy administration practices described herein.

79.    There are numerous and substantial questions of law and fact common to all Class Members. Included within the common questions are:

(a)    Whether Liberty National discriminated against Class Members by charging them more in premiums for Industrial Life Insurance than similarly situated Caucasian people;

(b)    Whether Liberty National discriminated against Class Members by offering only substandard products to African-Americans;

(c)    Whether Liberty National discriminated against Class Members by altering the debit system of collection unilaterally;

(d)    Whether Liberty National acted with scienter when discriminating against Class Members;

(e)    Whether Liberty National breached its contracts with Plaintiffs and the Class by changing its administration of its Industrial Policies;

(f)    Whether Liberty National routinely failed to disclose to Plaintiffs and Class Members material information about their contracts such as the actual basis on which premiums would be calculated and the likelihood that, during the policyholder's normal life expectancy premium payments would exceed the face value of the Policies or a reasonable amount of total premiums;

(g)    Whether Liberty National developed, encouraged and engaged in a scheme designed to sell and administer Industrial Policies through fraudulent concealment of material facts;

(h)    Whether Liberty National failed to supervise and train its agents who engaged in the schemes described herein and failed to prevent its agents from violating uniformly applicable state insurance laws and regulations;

(i)    Whether Liberty National breached its contracts with the Plaintiffs and the Class by refusing or deliberately failing to provide the true amount of life

insurance that their premiums would buy under "white" policies;

(j)     Whether Liberty National failed to adequately supervise, educate and train its agents regarding the terms of its Policies, appropriate methods of sales presentations, creation of sales materials and information, and compliance with state and federal laws (including state insurance laws and regulations), and whether Liberty National's failure to do so constituted a means by which Liberty National engaged in the schemes described herein;

(k)     Whether Liberty National engaged in a nationwide discriminatory course of conduct in targeting the sale of Industrial Life Insurance to an economically disadvantaged and unsophisticated segment of the population and marketed and sold such Policies in a manner to induce the purchase of the Industrial Policies by Plaintiffs and Class Members, and whether Liberty National discriminated against Class Members in establishing premiums for Industrial Policies;

(l)     Whether Plaintiffs and Class Members are entitled to specific performance, disgorgement, restitution, increased death benefits, injunctive relief, declaratory relief or other equitable relief against Liberty National;

(m)     Whether Plaintiffs and Class Members are entitled to an award of punitive damages against Liberty National;

(n)     Whether Liberty National terminated or altered the debit system and failed to provide a premium rebate or reduction, even though the Policies were expense loaded for weekly collection; and

(o)     Whether Liberty National's conduct was undertaken with malice or with reckless indifference to the rights of the Class Members to be free from racial discrimination to warrant an award of punitive damages incidental to the equitable relief sought by plaintiffs and Class Members, and the amount of punitive damages which should be awarded to punish Liberty National and deter others from similar conduct.

80.     The claims of the Plaintiffs are typical of the claims of the Class, and

Plaintiffs have no interest adverse to the interests of other Class.

81.   Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel experienced and competent in prosecution of insurance class actions and complex litigation.

82.   Liberty National is unwilling to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief.

83.   Most individual Class Members have little ability to prosecute an individual action, due to the complexity of the issues involved in this litigation, the size and scope of Liberty National's uniform sales scheme, the significant costs attendant to litigation on this scale, and the comparatively small, although significant, damages suffered by individual Class Members.

84.   This action will result in an orderly and expeditious administration of Class claims. Economies of time, effort and expense will be fostered and uniformity of decisions will be insured.

85.   This action presents no difficulty that would impede its management by the Court as a class action and a class action is superior to other available methods for the fair and efficient adjudication of their claims.

86.   Plaintiffs seek preliminary and permanent injunctive and equitable relief on behalf of the entire Class, on grounds generally applicable to the entire Class, to require Liberty National to specifically perform the Policies as represented and to disgorge any premium overcharges.

87.   Because plaintiffs and Class Members only recently have learned of Liberty National's discriminatory scheme, and many Class Members remain unaware of Liberty National's wrongful deeds, they did not suffer mental anguish or emotional distress damages, and no such compensatory damages are claimed.

88.   Based upon the intentional and egregious conduct of Liberty National, plaintiffs and Class Members are entitled to an award of punitive damages. The

entitlement to those damages and the appropriate amount of such punitive damages is incidental to the request for equitable relief and flows from the same conduct which entitles plaintiffs and Class Members to equitable relief. Therefore, the award of punitive damages is appropriate under Rule 23(b)(2).

89.    Plaintiffs alternatively allege that the requirements of Rule 23(b)(1), Federal Rules of Civil Procedure, are satisfied concerning plaintiffs' punitive damage claim. The prosecution of separate actions by the individual Class Members will create a risk that any punitive award to an earlier litigant would essentially prevent, impair or impede the right of later Class Members to seek punitive damages and/or would expose Liberty National to potentially duplicative punitive damage awards in excess of due process limitations.

90.    This action will result in an orderly and expeditious administration of Class claims. Economies of time, effort and expense will be fostered and uniformity of decisions will be insured.

## COUNT I

### (Race Discrimination 42 U.S.C. §1981)

91.    Plaintiffs repeat, reallege, and incorporate herein by reference the paragraphs above as if fully set forth herein.

92.    Defendant intentionally and purposefully discriminated against Plaintiffs and Class Members by charging them higher premiums than those charged to similarly situated Caucasian policyholders and by prohibiting or specifically instructing their agents to not offer or sell participatory whole life or other reasonably priced policies or products to African-Americans.

93.    By charging higher premiums to African-Americans and refusing to offer participatory whole life or other reasonably priced policies or products to African-Americans, Liberty National violated the rights of Plaintiffs and Class Members to make and enforce contracts on the same terms as Caucasian policyholders.

94.    Defendant's actions violate 42 U.S.C. §1981, as well as the rights of Plaintiffs and the Class under the Fifth, Thirteenth, and Fourteenth Amendments of the Constitution of the United States.

95.    Defendant has damaged Plaintiffs and Class Members because Plaintiffs and the Class have suffered harm as a result Liberty National's illegal racial discrimination.

## COUNT II

### (Race Discrimination 42 U.S.C. §1982)

96.    The plaintiffs repeat, reallege, and incorporate by reference the paragraphs above as if fully set forth herein.

97.    Life insurance is personal property within the meaning of 42 U.S.C. §1982.

98.    Liberty National has discriminated against Plaintiffs and the Class with respect to the Industrial Life Insurance they have inherited, purchased, and held. Plaintiffs and Class Members have not had the same right to inherit, purchase, and hold the insurance sold by defendant. Liberty National has violated 42 U.S.C. §1982.

99.    Liberty National's violation of 42 U.S.C. §1982 was intentional and malicious.

100.   Plaintiffs and the Class have continued to hold Polices within the time period or periods allowed under the Plaintiffs' claims.

101.   As a proximate result of Liberty National's violation of 42 U.S.C. §1982, Plaintiffs and the Class have been harmed.

## COUNT III

### (Breach of Contract)

102.   Plaintiffs repeat, reallege and incorporate herein by reference the paragraphs above.

- 24 -

103.  As a material part of the insurance agreement between Liberty National and Plaintiffs and the Class (either through the express terms of the Policies, applicable statutory provisions or the course of dealing of the parties) from inception of certain policies, premium payments were collected by debit agents for Liberty National on a weekly basis.

104.  Beginning in or about 1995 or 1996, Liberty National Life Insurance Company began and continues to unilaterally dismantle and/or alter the established weekly debit collection system which had been the established method of premium collection since inception of certain Policies, and thereafter required premium payments to be made directly to Liberty National by Plaintiffs and the Class or collected them on a less frequent basis.  At the same time, Liberty National continued to demand and collect the same premium paid under the original debit system even though it was no longer providing the same debit collection to the policyholder.  In this respect Liberty National collected premiums for coverage which was not provided, or in other words, collected unearned premiums.

105.  By dismantling or altering the established debit premium collection system and thereby unilaterally altering the method of premium collection, Liberty National breached a material contractual term of its agreement with Plaintiffs.  As a result of the breach, Plaintiffs and the Class have suffered harm and are entitled to specific performance.  By paying premiums directly rather than through the debit procedure contemplated at the time of contracting, Class Members have lost a bargained-for service with no corresponding decrease in premiums.  Plaintiffs have also been forced to incur additional burdens and expenses in making such payments.  In addition, Liberty National's discontinuance of the debit premium collection system resulted in the lapse of numerous policies.

106.  Alternatively, Liberty National has been unjustly enriched by continuing to collect expense loads attributable to the weekly debit collection system, even though that system was dismantled.  These premium expense loads exceed the expense of the

new, less-costly, premium collection systems. Plaintiffs and the Class have suffered an equitable detriment from this wrongful conduct by Liberty National. Therefore, the law implies a debt founded in equity, as it were upon a contract to recover back money, which ought not to be kept by Liberty National as an ill-gotten gain.

## OTHER COUNTS

107.    Solely for the purpose of preserving Plaintiffs' right to appeal the Court's July 3, 2000 Memorandum Opinion and Order on Plaintiffs' motion to alter or amend the judgment of the Court and for leave to file an amended complaint, Plaintiffs reallege and incorporate by reference the following counts and related allegations of plaintiffs' Class Action Complaint, filed December 8, 1999: Count II (Breach of Fiduciary Duty), Count III (Assumpsit on Money Had and Received), Count IV (Declaratory and Injunctive Relief), Count V (Unjust Enrichment and Imposition of a Constructive Trust), Count VI (Improper Hiring, Supervision, Retention, and Failure to Monitor Actions of Officers and Agents and/or Employees), Count VIII (Fraudulent Inducement), and Count IX (Negligent Misrepresentation).

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs demand judgment against Liberty National for themselves and Class Members as follows:

A.    An order determining that the action is a proper class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure and in the alternative for plaintiffs' punitive damage claim only, that the claim should proceed under Rule 23(b)(1);

B.    Granting extraordinary equitable, declaratory and/or injunctive relief as permitted to remedy the effects of Liberty National's racially discriminatory conduct, including a permanent injunction enjoining Liberty National from collecting any discriminatory premiums or paying discriminatory benefits in the future and ordering Liberty National to increase the death benefits, cash values, endowment benefits and non-forfeiture benefits to the level comparable to the benefits paid on policies sold to

Caucasians;

C.    Entering an order declaring that Liberty National engaged and continues to engage in a pattern and practice of unlawful discriminatory conduct and declaring the specific pricing, underwriting and policy administration practices of Liberty National to be discriminatory.

D.    Granting equitable relief as permitted by law or equity, including restitution, reformation and attaching, impounding or imposing a constructive trust upon, or otherwise restricting the proceeds of Liberty National's ill-gotten funds to ensure plaintiffs and Class Members have an effective remedy;

E.    Requiring Liberty National to disgorge any premium overcharges, plus interest, and otherwise to reform subject policies in compliance with equity;

F.    Awarding plaintiffs and Class Members punitive damages either as incidental to the equitable relief awarded or appropriate other relief based upon Liberty National's conduct;

G.    Awarding Plaintiffs and the Class punitive damages in an amount to be proven at trial for the wrongful acts complained of;

H.    Awarding Plaintiffs and the Class their costs and disbursements incurred in connection with this action, including reasonable attorneys' fees, expert witness fees and other costs;

I.    Ordering specific performance on the insurance contracts; and

J.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs, on behalf of themselves and all others similarly situated, hereby demand trial by jury on all issues triable at law.


JOE R. WHATLEY, JR.
CHARLENE P. FORD
WHATLEY DRAKE, LLC
2323 Second Avenue North
Birmingham, AL 35203
Telephone: 205/328-9576
205/328-9669 (fax)

MILBERG WEISS BERSHAD
 HYNES & LERACH LLP
JOHN J. STOIA, JR.
TIMOTHY G. BLOOD
ANDREW W. HUTTON
SUSAN COLLYER
401 B Street, Suite 1700
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

MILBERG WEISS BERSHAD
 HYNES & LERACH LLP
MELVYN I. WEISS
One Pennsylvania Plaza
New York, NY 10119-0165
Telephone: 212/594-5300
212/868-1229 (fax)

MILBERG WEISS BERSHAD
 HYNES & LERACH LLP
MICHELLE WILLIAMS COURT
355 South Grand Avenue
Suite 4170
Los Angeles, CA 90071
Telephone: 213/617-9007

- 28 -

JAMES, HOYER, NEWCOMER
& SMILJANICH, P.A.
W. CHRISTIAN HOYER
CHRISTA L. COLLINS
One Urban Centre, Suite 550
4830 West Kennedy Blvd.
Tampa, FL 33609
Telephone: 813/286-4100
813/286-4174 (fax)

WATSON JIMMERSON, P.C.
HERMAN WATSON
REBEKAH KEITH
203 Greene Street
Huntsville, AL 35801
Telephone: 256/536-7423
256/536-2689 (fax)

BONNETT, FAIRBOURN, FRIEDMAN
& BALINT, P.C.
ANDREW S. FRIEDMAN
2901 N. Central Avenue, Suite 1000
Phoenix, AZ 85012-3311
Telephone: 602/274-1100
602/274-1199 (fax)

PARRY DEERING FUTSCHER
& SPARKS, P.S.C.
RONALD R. PARRY
128 East Second Street
Covington, KY 41012
Telephone: 859/291-9000
859/291-9300 (fax)

Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon all Attorneys of Record in the above styled cause by placing a copy of the same, properly addressed and postage prepaid, in the United States Mail on this the _22nd_ day of February, 2002.

William J. Baxley, Esq.
William C. Barclift, Esq.
Baxley, Dillard, Dauphin & McKnight
2008 3rd Avenue South
Birmingham, AL  35233

Michael R. Pennington, Esq.      .
James Warren May, Esq.
Bradley, Arant, Rose & White, LLP
2001 Park Place, Suite 1400
Birmingham, AL  35203-2736

Floyd Gaines, Esq.
Gaines & Davis
513 21st Street North
Birmingham, AL  35203

Of Counsel

- 30 -

**A**

DEC-08    9:02 AM    WATSON, FEES, & JIMMERSON    ( NC. 1 256 533 2563    P. 03



CX-A-3

READ YOUR POLICY

(AMOUNT OF INSURANCE GRADED FOR AGES UNDER 31)

PREMIUMS PAYABLE FOR 10 YEARS

BIRMINGHAM, ALA.

*Service* INSURANCE COMPANY *of Alabama*

10 PAYMENT LIFE INSURANCE

## SCHEDULE

CX-8-51

| NAME OF INSURED | BENEFICIARY | TYPE POLICY | |
|---|---|---|---|
| MOORE ELLEN G | MOORE PAULINE | CX | CX |

| CX | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 929921 | 11 | 15 | 54 | 5 | 55 | $ 500 | 4 | 115 |
| POLICY NUMBER | MO. | DAY | YR. | AGE* | (CENTS) WEEKLY PREMIUM | AMOUNT OF INSURANCE | DIST. | DEBIT |
| | DATE OF ISSUE | | | | | | | |

*INSURED'S AGE NEXT BIRTHDAY

## REGISTER OF CHANGE OF BENEFICIARY

NOTE—NO CHANGE, DESIGNATION OR DECLARATION, SHALL TAKE EFFECT UNTIL ENDORSED ON THIS POLICY BY THE COMPANY AT ITS HOME OFFICE.

| DATE ENDORSED | BENEFICIARY | ENDORSED BY |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |

Burial Service Company of Alabama having discharged each and every obligation and liability set forth and stipulated herein, the undersigned beneficiary under this policy hereby surrenders the said policy and certifies that there is held against the said company no further claims hereunder.

_____        _____
WITNESS                                      BENEFICIARY

Dated at_____this_____day of_____19___

# *Service*
## INSURANCE COMPANY
## *of Alabama*

BIRMINGHAM, ALA.

Will pay to the beneficiary in accordance with the provisions of this Policy the amount of insurance granted hereunder upon receipt of due proof of the death of the Insured whose name appears in the schedule on the fourth page hereof.

CONSIDERATION—The Insurance is granted hereunder in consideration of the payment in advance of the weekly premium stated in the schedule on Page 4 hereof on or before each Monday beginning with the date of issue of this Policy and continuing until premiums shall have been paid for 10 years or until prior death of the Insured.

AMOUNT OF INSURANCE—The amount of of insurance hereunder is the amount set out in the schedule herein, unless at date of death the Insured is under three years of age, in which event, the amount payable for each $100 set out in the said schedule shall be as follows:

     (a)  Under three months of age at death, twelve dollars;
     (b)  Three months or over but under one year of age at death, eighteen dollars;
     (c)  One year or over but under two years of age at death, twenty-four dollars;
     (d)  Two years or over but under three years of age at death, sixty-five dollars;
     (e)  Three years of age or over at death, full benefit.

(1) PAYMENT OF PREMIUM—All premiums are payable at the Home Office of the Company weekly in advance, but may be paid to an authorized representative of the Company, provided that such payment must be entered at the time in the premium receipt book belonging with this Policy. The failure of the collector to call for the premium on the Policy will not be an excuse for non-payment as the Insured will then be required to pay the premium at a Branch Office of the Company or remit the same to the Home Office.

(2) PREMIUMS PAYABLE OTHER THAN WEEKLY—The premium stated in the schedule of this Policy is a weekly premium. However, if premiums are paid Annually (52 weeks) in advance at one time, such Annual Premium shall be calculated by multiplying the stated weekly premium by 46.8. If premiums are paid Semi-Annually (26 weeks) in advance at one time, the Semi-Annual Premiums shall be calculated by multiplying the weekly premium stated by 24.7.

(3) GRACE PERIOD—A grace period of four weeks shall be granted for the payment of every premium after the first, during which time this Policy will remain in force subject to the terms hereof, but after the expiration of the said period of grace the Company's liability under this Policy shall cease except as to the Non-Forfeiture privileges herein contained.

(4) REINSTATEMENT—In the event this Policy should lapse it may be reinstated at any time within three years after due date of the first premium in such default, upon the furnishing to the Company of evidence of insurability satisfactory to the Company and the payment of all premiums in default unless the Extended Insurance has expired or the Cash Surrender Value has been paid.

(5) EFFECTIVE DATE—This Policy shall take effect on its date of issue, provided the Insured is then alive and in sound health, but not otherwise.

CONDITIONS AND PROVISIONS—This Policy is issued and accepted subject to all of the terms, conditions, provisions, schedules, registers and endorsements printed or written by the Company on this or the succeeding pages hereof, which are a part of this Policy as fully as if recited over the signatures hereto affixed.

In Witness Whereof, The Company has caused this Policy to be executed by its President and Secretary at its Home Office in Birmingham, Alabama, as of the date of issue appearing herein.



*A C Brown*                           *W B Sowell*

SECRETARY                              PRESIDENT

10 PAYMENT LIFE INSURANCE—PREMIUMS PAYABLE 10 YEARS

# TABLE OF NON-FORFEITURE BENEFITS

## FOR A POLICY FOR WHICH THE AMOUNT OF INSURANCE IS $100

| Age at Issue | 2 YRS. | | 3 YEARS | | | 4 YEARS | | | 5 YEARS | | | 6 YEARS | | | 7 YEARS | | | 8 YEARS | | | 9 YEARS | | | 10 YEARS | | | Age at Issue |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Ext. Ins. Mos. A | Ext. Ins. Mos. A | Paid Up Ins. B | Ext. Ins. Mos. A | Paid Up Ins. B | Cash Value C | Ext. Ins. Mos. A | Paid Up Ins. B | Cash Value C | Ext. Ins. Mos. A | Paid Up Ins. B | Cash Value C | Ext. Ins. Mos. A | Paid Up Ins. B | Cash Value C | Ext. Ins. Mos. A | Paid Up Ins. B | Cash Value C | Ext. Ins. Mos. A | Paid Up Ins. B | Cash Value C | Ext. Ins. Mos. A | Paid Up Ins. B | Cash Value C | |

*To obtain the amount of Paid-Up Insurance or the Cash Surrender Values for a policy for which the ultimate amount of Insurance is greater or less than $100, the value stated should be increased or decreased proportionately; e.g., if the ultimate amount of Insurance is $200 the value should be doubled. The periods of Extended Insurance are the same whatever the amount of Insurance.

†Premiums must have been paid on this Policy for the number of years indicated in the first line of this foregoing table to obtain the benefits indicated.

DEC-0    WED 09:04 AM    WATSON, FEES, & JIMMERSON        NO. 1 255 536 2669        P. 06

(6)  MISSTATEMENT OF AGE—In the event the age at issue is incorrectly stated herein, the Amount of Insurance hereof shall be such as the premiums paid would have purchased at the correct age, and all other benefits shall be based on such correct age and such amount of insurance.

(7)  INCONTESTABILITY—After this Policy has been continued in force during the lifetime of the Insured for a period of one year from its date of issue it shall thereafter be incontestable except for non-payment of premiums.

(8)  BENEFICIARY—By written notice to the Company the Insured may from time to time name a new beneficiary, subject to evidence of insurable interest satisfactory to the Company, but no such change shall be effective until endorsed on this Policy by the Company.

If the beneficiary dies before the Insured the Estate of the Insured shall then automatically become the beneficiary thereof.  If the Insured's estate is the Beneficiary, the Company will make payment to the Insured's executor or administrator, provided, however, that the Company may make payments to any relative by blood or marriage, or to any person appearing to the Company to be equitably entitled to such payment because of having incurred expense for the maintenance, medical attention or burial of the Insured.  If the beneficiary is a minor, or is otherwise not legally qualified to give a valid release at the time of payment hereof the Company may make payment to any person who furnishes evidence satisfactory to the Company that such person is responsible for, or is actually contributing to the support of the beneficiary.

(9)  POLICY CONTROL—If the Insured hereunder is a minor, during the minority of such Insured, the right to change the beneficiary and exercise all the rights of ownership under this Policy shall be vested in the beneficiary named herein from time to time; or if such beneficiary dies before the Insured, then such rights shall be vested in the surviving parent of the Insured, or in the legal guardian of the Insured, or in any adult having the custody and control of said minor.  After the Insured becomes of age, the entire ownership and control of this Policy shall be vested in the Insured.

(10)  ASSIGNMENT—Neither this Policy, nor any benefit hereunder can be assigned.

(11)  LOSS OF EYESIGHT OR LIMBS—After the third anniversary of the Insured's birth and during the lifetime of the Insured, if the Company shall receive due proof that during the continuance of this Policy, otherwise than as Extended Insurance or reduced Paid-Up Insurance provided in the Non-Forfeiture Benefits, the Insured has suffered any of the losses set forth below solely as a result of disease contracted or injuries sustained after the date hereof and that thirty days have elapsed since such loss, total and permanent disability shall then be deemed to exist, and upon surrender of this Policy and its premium receipt books, the Company will make immediate payment as set forth below, provided, however, that such loss was not sustained from service in the Military or Naval forces of any country at war.

A sum equal to the amount insured hereunder shall be payable in the event of

( i) loss by severance of both hands at or above the wrists;

( ii) loss by severance of both feet at or above the ankles;

(iii) loss by severance of one hand at or above the wrist and one foot at or above the ankle;

(iv) complete and irrecoverable loss of sight of both eyes prior to the seventieth anniversary of the Insured's birth.

In addition to the payments set out herein for such loss the Company will endorse this Policy with a waiver of all further premiums, paying at death the amount insured hereunder.

(12)  OPTION TO SURRENDER WITHIN TWO WEEKS—If the terms of this Policy are not accepted and agreed to it may be surrendered for cancellation at the District Office of the Company through which it was delivered within two weeks from the date hereof and all premiums paid will be refunded.

(13)  PRIVILEGE OF EXCHANGE—Upon written application and evidence of insurability satisfactory to the Company this Policy may be surrendered to the Company in exchange for another policy on any plan then issued by the Company requiring premium payments less frequent than weekly, provided, the new policy is for at least the minimum amount issued by the Company on the plan applied for.  In executing such change the full reserve on this Policy shall be applied to reduce premium payments on the new policy in accordance with the terms and conditions then agreed upon with the Company.

(14)  NON-FORFEITURE BENEFITS—Extended Insurance—In the event this Policy lapses after premiums have been paid for the respective periods shown in the Table of Non-Forfeiture Values herein the Amount of Insurance granted under this Policy shall be automatically continued in force as Extended Insurance for the number of months specified in the column marked "A" in the said Non-Forfeiture Table.  The term of Extended Insurance shall commence on the due date of the first premium in default.

(A)  PAID-UP LIFE INSURANCE—After this Policy has been in force with premiums paid for the number of years shown in the table below, the Insured may, by making written application upon blanks furnished by the Company within thirteen weeks of the due date of the first premium in default, have this Policy endorsed for a reduced amount of Paid-Up Life Insurance payable at the death of the Insured.  Such amount shall be in accordance with the amount stated in Column "B" in the table of Non-Forfeiture Values, provided, however, that such amount of Paid-Up Life Insurance shall be in lieu of Extended Insurance.

(B)  CASH SURRENDER VALUE—After this Policy has been in force with premiums paid for five full years upon written request to the Company and the surrender of this Policy and all premium receipt books or other evidence of premium payments the Company will pay the Cash Surrender Value set out in Column "C" in the Table of Non-Forfeiture Values less any indebtedness due the Company hereon.  Such written request must be made within thirteen weeks of the due date of the first premium in default.

The basis of reserves for this Policy is the 1941 Standard Industrial Mortality Table (Illinois Standard) with interest at 3¼% per year.

For the years subsequent to the 20th the values are to be the equivalent of the full reserves according to the foregoing standard.  Proportionate increase will be made in the non-forfeiture values shown in the table for each additional completed quarter year of premium payments.

(15)  ALTERATION AND WAIVERS—This Policy contains the entire agreement between the Company and the Insured.  Its terms cannot be changed or its conditions varied, except by a written agreement, signed by the President or Secretary of the Company.  No other person shall have the power to make or alter contracts, waive forfeiture, or receive premiums on policies in arrears more than four weeks, or to receipt for the same, and all such arrears given to an agent or employee shall be at the risk of those who pay them and shall not be credited upon the Policy, whether receipted or not, except as set forth in the "Reinstatement" provision herein.

The maximum amount of cash insurance to any policyholder of this Company is limited to Five Hundred Dollars ($500.00) for natural death.  The total liability of this Company for all policies of cash insurance in force by it on the life of the person insured by this Policy for natural death shall be the lesser of Five Hundred Dollars ($500.00) or the sum of benefits payable under all such policies.

**B**



BURIAL POLICY

SERVICE *of Alabama*

INSURANCE COMPANY

BIRMINGHAM, ALA.

PREMIUMS PAYABLE FOR
15 YEARS

READ YOUR POLICY

AUTHORIZED |UNDERTAKER

F-6-55.

DUPLICATE

## SCHEDULE

DUPLICATE

| NAME OF INSURED | BENEFICIARY | | | | | | TYPE POLICY |
|---|---|---|---|---|---|---|---|
| WILLIAMS FANNIE | VOID - SEE ENDORSEMENT WILLIAMS CURTIS T. | | | | | F | F |

| F | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 2341927 | 4 | 5 | 65 | 38 | $.28 WK | $300.00 | 36 | 21 | |
| POLICY NUMBER | MO. | DAY | YR. | AGE* | (CENTS) WEEKLY PREMIUM | RETAIL VALUE (ADULTS) | DIST. | DEBIT | |
| | | DATE OF ISSUE | | | | | | | |

*INSURED'S AGE NEXT BIRTHDAY

F-6-55



LIBERTY NATIONAL LIFE INSURANCE COMPANY
BIRMINGHAM, ALABAMA

PAID-UP POLICY CERTIFICATE

| NAME OF INSURED | TYPE | POLICY NO. | ISSUE DATE | | | PAID-UP DATE | | |
|---|---|---|---|---|---|---|---|---|
| | | | MO. | DAY | YR. | MO. | DAY | YR. |
| MCCONNELL FANNIE V | F | 2341727 | 4 | 5 | 65 | 3 | 17 | 0 |

DATE

| BALANCE | AGENT | AGE AT ISSUE | PREMIUM | PAID-UP DATE | | |
|---|---|---|---|---|---|---|
| | | | | MO. | DAY | YR. |
| 36 | 37 | 30 | 2U | 3 | 17 | 0 |

Ms. Fannie McConnell
General Delivery
Collinsville, AL 35961

THIS CERTIFICATE SHOULD BE
ATTACHED TO THE POLICY
IT DESCRIBES

• SEE REVERSE SIDE •

OVERPAYMENT OF PREM.
$ *****24 *

NET OVERPAYMENT
FOR WHICH A
CHECK IS ENCLOSED

THIS IS TO CERTIFY THAT THE POLICY DESCRIBED
ABOVE IS NOW PAID-UP FOR LIFE AND NO MORE
PREMIUMS WILL BE DUE.

LIBERTY NATIONAL LIFE INSURANCE CO.

SECRETARY

C



FUNERAL POLICY

WEEKLY PREMIUMS PAYABLE FOR 12 YEARS

BENEFIT FOR ACCIDENTAL DEATH

NONPARTICIPATING INDUSTRIAL POLICY

SERVICE INSURANCE COMPANY
of Alabama

Division of Liberty National Life Insurance Co.
Birmingham, Alabama

## SCHEDULE

| NAME OF INSURED | | BENEFICIARY | | | | PREMIUMS PAYABLE | TYPE 330 |
|---|---|---|---|---|---|---|---|
| SEE ENDORSEMENT E | | WILLIAMS SPENCER | | | | WK | 330 |
| 14758551 | 11  24  69 | 42 | 036 | | $300 | 712  36 | 15  37 |
| POLICY NUMBER | MO.  DAY  YR. DATE OF ISSUE | AGE LAST BIRTHDAY AT DATE OF ISSUE | (CENTS) WEEKLY PREMIUM | | RETAIL VALUE | DISTRICT | AGENCY |

*For death prior to age ten, the retail value is a reduced amount providing comparable benefits.

DEC-30-1999 09:25    : 256 536 2669    56%    P.12

## REGISTER OF CHANGE OF BENEFICIARY

NOTE—NO CHANGE, DESIGNATION OR DECLARATION, SHALL TAKE EFFECT UNTIL ENDORSED ON THIS POLICY
BY THE COMPANY AT ITS HOME OFFICE.

| DATE ENDORSED | BENEFICIARY | ENDORSED BY |
|---|---|---|
| DATE 1-3-78 | | |
| NAME OF INSURED CHANGED TO | | |
| _Faddie W. McDaniell_ | | |
| LIBERTY NATIONAL LIFE INSURANCE CO. | | |
| by _N.Y.A._ | | |
| SECRETARY | | |
| Approved by _W.H.Berlin_ | | |

---

Service Insurance Company of Alabama, Division of Liberty National Life Insurance Company, having discharged each and every obligation and liability set forth and stipulated herein, the undersigned beneficiary under this policy hereby surrenders the said policy and certifies that there is held against the said company no further claims hereunder.

_____    _____
WITNESS                         BENEFICIARY

Dated at_____this_____day of_____, 19_____



LIBERTY NATIONAL LIFE INSURANCE COMPANY
BIRMINGHAM, ALABAMA

PAID-UP POLICY CERT...

| NAME OF INSURED | TYPE | POLICY NO. | ISSUE DATE | | | DISTRICT | MARCH | AGE AT ISSUE | PREMIUM | DATE PAID UP | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | MO. | DAY | YR. | | | | | MO. | DAY | YR. |
| MCCONNELL FANNIE W | 330 | 14750891 | 11 | 24 | 69 | 34 | 24 | 42 | 36 | 11 | 9 | b |

Fannie McConnell
P. O. Box 208
Collinsville, Al. 35961

OVERPAYMENT OF PREM.
なまだ＊＊＊＊＊＊＊＊ ¥.¥¥

THIS IS TO CERTIFY THAT THE POLI...
ABOVE IS NOW PAID-UP FOR LIFE AN...
PREMIUMS WILL BE DUE...
LIBERTY NATIONAL LIFE INS...

THIS CERTIFICATE SHOULD BE
ATTACHED TO THE POLICY
IT DESCRIBES

**D**



36- 37

The following endorsement shall take effect
only if the policy is in force as of
DATE   7-3-78
NAME OF INSURED CHANGED TO
Laurie W. McConnell
LIBERTY NATIONAL LIFE INSURANCE CO.

by Jim L. Burseau
SECRETARY
Approved by W.H. Barton

```
       5 2
       1 2
      104
      5 2
12 / 6 24  [ 5 2 per month
      6 0
        24
```

DEC-05    WED 19 13 41   WATSON, FEES, & JIMMERSON   . NO. 1 256 536 2359      P. 16

## ACCIDENT POLICY

# LIBERTY NATIONAL
## LIFE INSURANCE COMPANY

BIRMINGHAM, ALABAMA

INSURANCE BENEFITS—We, Liberty National Life Insurance Company, enter into this agreement with you, the insured named in the schedule on Page 4. Beginning with the date of issue shown in the schedule we insure you for the amounts shown in the table below if premiums are paid as provided under "Premiums." Terms used in the table are defined in the following paragraphs.

| TABLE OF INSURANCE BENEFITS | | | |
|---|---|---|---|
| | BENEFIT PAYABLE | | |
| BENEFIT FOR | First Policy Year | From Second Policy Year Until Policy Anniversary Preceding 65th Birthday | Thereafter Until Policy Anniversary Preceding 70th Birthday |
| Accidental Death | $1,000 | $2,000 | $1,000 |
| Death by Travel Accident | 3,000 | 6,000 | 3,000 |
| Loss of Eyesight | 2,500 | 5,000 | 2,500 |
| Loss of One Limb | 1,000 | 2,000 | 1,000 |
| Loss of Two or More Limbs | 2,500 | 5,000 | 2,500 |

On the anniversary of the date of issue immediately preceding your 70th birthday this policy will terminate and cease to be in force.

ACCIDENTAL DEATH—Accidental death means death which is caused solely and directly by accidental injury and occurs within 90 days of such injury. Accidental injury means bodily injury effected solely through external and accidental means. No benefit for accidental death will be payable if death results directly or indirectly from any disease, illness, or infirmity or medical or surgical treatment therefor or from any of the "Exclusions from Coverage" listed below or if a benefit is payable under the provisions relating to "Death by Travel Accident" or "Loss of Eyesight or Limb."

DEATH BY TRAVEL ACCIDENT—Death by travel accident means death for which the accidental death benefit would otherwise be payable but which results from injuries sustained while you are a fare-paying passenger in a streetcar, bus, taxicab, train, airplane, steamship, or other vehicle operated as a public conveyance by a licensed common carrier for the transportation of passengers, or while you are a passenger in a school bus which is being operated during the regular session of a recognized public or private school for the transportation of students to or from school or to or from any organized school extracurricular activity.

LOSS OF EYESIGHT OR LIMB—Loss of eyesight means the total and irrecoverable loss of the entire sight of both eyes. Loss of a limb means the loss of a hand or foot by severance. Any loss must be caused solely by disease or injuries sustained after the date of issue and you must survive the loss by at least 30 days. The maximum cumulative benefit payable under this provision is $5,000.

The payment of any benefit under this provision shall terminate this Policy.

EXCLUSIONS FROM COVERAGE—This policy does not provide a benefit for any loss caused or contributed to by:

(1)  suicide while sane, or self-destruction or any attempt thereat while insane, or injuries intentionally inflicted upon yourself, whether sane or insane,

(2)  injuries intentionally inflicted upon you by any person unless such person was in the course of committing a robbery or burglary or an attempt thereat.

(3)  participating in an assault or felony,

(4)  operating or riding in or descending from any kind of aircraft of which you were the pilot, officer, or member of the crew, or in which you were giving or receiving training or instruction or had any duties,

(5)  war or act of war (including insurrection, undeclared war, and armed aggression or its resistance), whether or not you are in military service of any country or international organization.

Benefit for Death by Accidental Means
Benefit for Death by Travel Accident
Benefit for Loss of Eyesight or Limb
Premiums Payable Until Policy Anniversary Immediately Preceding Insured's 70th Birthday
This Policy Is Noncancellable and Guaranteed Renewable Until the Policy
Anniversary Immediately Preceding Insured's 70th Birthday

PREMIUMS—The consideration for this policy is the payment of the premiums when they are due, and no insurance will become effective until the first premium has been paid. Premiums under this policy are payable either weekly or monthly as specified in the schedule on page 4 in the amount shown in the schedule. If premiums are payable weekly, they are due each Monday beginning with the date of issue; if payable monthly, they are due on the first of each month beginning with the date of issue. Premiums are payable until the policy anniversary immediately preceding the insured's 70th birthday. Premiums must be paid to one of our agents or to the cashier at one of our offices. If our agent does not call for any premium when it is due, payment of the premium is not excused, and in such case it is your responsibility to see that the payment is made at one of our offices.

POLICY CONTROL—If you are over 16 years of age, you have the entire ownership and control of this policy. If you are less than 16 years of age, the ownership and control of this policy will be vested in the beneficiary named herein from time to time until you reach your 16th birthday. In such case, if the beneficiary should die or cease to have custody and control of you, then ownership and control of this policy will be vested in the parent or legal guardian or other adult having custody and control of you. The ownership and control of this policy includes the right to change the beneficiary and to exercise all other privileges granted in this policy.

ENTIRE CONTRACT—This policy, including any endorsements and attached papers, is the entire contract between us. None of its provisions may be waived or changed except by written endorsement on this policy or on paper attached to this policy signed by the President, a Vice-President, the Secretary, an Assistant Vice-President, or an Assistant Secretary of the Company. No agent has authority to change this policy or to waive any of its provisions.

INCONTESTABILITY—After this policy has been in force for a period of two years during the lifetime of the insured, it shall become incontestable as to the statements contained in the application. No claim for loss incurred commencing after two years from the date of issue of this policy shall be reduced or denied on the ground that a disease or physical condition not excluded from coverage by name or specific description, effective on the date of loss had existed prior to the effective date of coverage under this policy.

GRACE PERIOD—A grace period of 4 weeks (or 31 days if premiums payable monthly) will be granted for the payment of each premium falling due after the first premium during which period this policy shall continue in force.

REINSTATEMENT—If any renewal premium is not paid within the time granted to you for paying the same, a subsequent acceptance of all premiums due and unpaid for a period not exceeding 8 weeks prior thereto by us or by any agent duly authorized by us to accept such premiums, shall reinstate this policy; provided, however, that if such agent requires, or if we require an application for reinstatement and a conditional receipt for the premium tendered is issued by us or by our agent, this policy will be reinstated upon our approval of such application, or, upon the forty-fifth day following the date of such conditional receipt unless we have previously notified you in writing of our disapproval of such application. The reinstated policy shall cover only death or other loss covered by this policy resulting from such accidental injury as may be sustained after the date of reinstatement and loss due to such diseases which may begin more than 10 days after such date. In all other respects, you and we shall have the same rights as provided under this policy immediately before the due date of the defaulted premium, subject to any provisions endorsed hereon or attached hereto in connection with the reinstatement.

NOTICE OF LOSS—Written notice of loss must be given to us within thirty days after your accidental death or other loss covered by this policy; or as soon thereafter as is reasonably possible. Notice given to us by you or on your behalf or on behalf of the beneficiary at our Home Office in Birmingham, Alabama, or to one of our authorized agents, with information sufficient to identify you, shall be notice to us.

CLAIM FORMS—Upon receipt of notice of loss we will furnish to the claimant such forms as are usually furnished for filing claims. If such forms are not furnished within fifteen days after giving such notice, the claimant shall be deemed to have complied with the requirements of this policy as to proof of loss upon submitting, within the time fixed in this policy for filing proofs of loss, written proof covering the occurrence, and the character of the death or loss for which claim is made.

**PROOF OF LOSS**—In the event of accidental death or death by travel accident written proof of loss must be furnished to us at our Home Office within 90 days after the date of such loss. In the event of loss of eyesight or limb written proof of loss must be furnished to us at our Home Office within one year after the date of such loss. Failure to furnish such proof within the time required shall not invalidate nor reduce any claim if it was not reasonably possible to furnish proof within such time, provided such proof is furnished as soon as reasonably possible and in no event, except in the absence of legal capacity, later than one year from the time proof is otherwise required.

**PAYMENT OF INSURANCE BENEFITS**—As soon as we receive due proof of loss covered by this policy we will immediately pay the benefit provided. Any benefit for loss of life will be paid to the beneficiary designated in this policy at the time of payment. If no such designation is then effective, or if the beneficiary does not survive you, such benefit will be paid to your estate. Any other accrued benefit unpaid at your death, may, at the option of the Company, be paid either to the beneficiary or to your estate. All other benefits provided by this policy will be paid to you.

**PHYSICAL EXAMINATIONS**—We shall have the right and opportunity, at our own expense, to examine your person when and as often as we may reasonably require during the pendency of a claim hereunder.

**LEGAL ACTION**—No action at law or in equity shall be brought to recover on this policy prior to the expiration of sixty days after written proof of loss required by this policy has been furnished. No such action shall be brought after the expiration of four years from the time written proof of loss is required to be furnished.

**BENEFICIARY**—The original beneficiary of this policy is named in the schedule on Page 4. You may change the beneficiary at any time by giving us written notice of the desired change and evidence satisfactory to us that the proposed beneficiary has an insurable interest in your life. No change of beneficiary will be effective until we have endorsed it on this policy.

**AGE LIMIT**—The insurance granted hereunder shall not cover any person over sixty years of age on the date of issue of this policy, unless we accept premiums with the knowledge that the person is over sixty years of age.

**MISSTATEMENT OF AGE**—Where there is a misstatement of your age as shown in the schedule on Page 4, the coverage provided by this policy shall not become effective if, according to your correct age, you were over 60 years of age on the date of issue. This policy shall terminate on the anniversary of the date of issue immediately preceding your 70th birthday. In the event your age has been misstated and if, according to your correct age, the coverage provided by this policy would not have become effective, or would have ceased prior to the acceptance of such premium or premiums, then the liability of the Company shall be limited to the refund, upon request, of all premiums paid for the period not covered by this policy.

If your age has been misstated, but if according to your correct age on the date of issue the coverage provided by this policy would have become effective, all amounts payable under this policy shall be such as the premium paid would have purchased at the correct age.

**OPTION TO SURRENDER**—If the provisions of this policy are not satisfactory, you may surrender it to us for cancellation within two weeks from the date of issue. If this is done, we will refund all premiums which have been paid on this policy.

**ASSIGNMENT**—You may not assign this policy or any of its benefits.

**CONFORMITY WITH STATE STATUTES**—Any provision of this policy which, on its date of issue, is in conflict with the statutes of the state in which you reside on such date is hereby amended to conform to the minimum requirements of such statutes.

*Signed at Birmingham, Alabama by the President and Secretary of Liberty National Life Insurance Company as of the date of issue shown in the schedule on Page 4.*

SECRETARY                          PRESIDENT

**E**

DEC-08-1999 WED 09:11 AM    .ON, FEES, & ZIMMERSON    FAX NO.    .  998 2669    P. 20



## SERVICE INSURANCE COMPANY OF ALABAMA

### FUNERAL POLICY

ISSUED BY
NATIONAL LIFE INSURANCE COMPANY
Birmingham, Alabama

FUNERAL POLICY

WHOLE LIFE INSURANCE

(BENEFIT GRADED FOR DEATH OF INSURED UNDER AGE 31 DAYS)

PREMIUMS PAYABLE UNTIL POLICY
ANNIVERSARY IMMEDIATELY PRECEDING
INSURED'S 65TH BIRTHDAY

ADDITIONAL BENEFIT FOR ACCIDENTAL DEATH
ADDITIONAL BENEFIT FOR DEATH BY
AUTOMOBILE ACCIDENT.
ADDITIONAL BENEFIT FOR DEATH BY
TRAVEL ACCIDENT
ADDITIONAL BENEFIT FOR LOSS OF
EYESIGHT OR LIMB

NONPARTICIPATING INDUSTRIAL POLICY

## SCHEDULE

TYPE
32/82

| POLICY NUMBER | NAME OF INSURED | BENEFICIARY | |
|---|---|---|---|
| | MCCONNELL FANNIE R | MCCONNELL JAMES | |

| DATE OF ISSUE | AGE | PREMIUM | AMOUNT OF FUNERAL BENEFIT | Month Day Year LAST PREMIUM PAYABLE | AGENCY | DISTRICT |
|---|---|---|---|---|---|---|
| | | 15 WEEKLY | STED | 1 13 1992 | | |

†If the named insured is under age 31 days at death, the Funeral Benefit will be one-half of the amount shown above.

## FUNERAL SERVICE AGREEMENT

AUTHORIZED FUNERAL DIRECTOR—We have entered into agreements with various Funeral Directors for the furnishing of funeral mer-
chandise and service in return for the Funeral Benefit payable under this policy. Such Funeral Directors are referred to herein, as

DEC-08-1999 WED 09:12 AM    .TSON, FEES, & JIMMERSON    FAX NO.    66 536 2669    P. 21



LIBERTY NATIONAL LIFE INSURANCE COMPANY
BIRMINGHAM, ALABAMA

**PAID-UP POLICY CERTIFICATE**

| NAME OF INSURED | TYPE | POLICY NO. | ISSUE DATE | | | DISTRICT | AGE AT ISSUE | PREMIUM | DATE PAID TO | | | PAIDUP DATE | | |
| | | | MO. | DAY | YR. | | | | MO. | DAY | YR. | MO. | DAY | YR. |
| McCONNELL, FANNIE W | 32U | 214+0092 | 5 | 13 | 74 | '67 | 32/46 | 4/24 | 4 | 1 | 92 | 4 | 1 | 92 |

Fannie McConnell
P. O. Box 208
Collinsville, AL   35961

*******  **

THIS IS TO CERTIFY THAT THE POLICY DESCRIBED
ABOVE IS NOW PAID-UP FOR LIFE AND NO MORE
PREMIUMS WILL BE DUE.

LIBERTY NATIONAL LIFE INSURANCE CO.

*William E. Bowdl*
SECRETARY

THIS CERTIFICATE SHOULD BE
ATTACHED TO THE POLICY
IT DESCRIBES

* SEE REVERSE SIDE *

M-3 Rd. 12-85

F

DEC-08  9 WED 03:13 AM  WATSON, FEES, & JIMMERSON    X NO. 1 256 536 2683    P. 25

BURIAL POLICY

SERVICE of Alabama

INSURANCE COMPANY

BIRMINGHAM, ALA.

PREMIUMS PAYABLE FOR 15 YEARS

READ YOUR POLICY

AUTHORIZED UNDERTAKER

DUPLICATE

SCHEDULE    DUPLICATE

| NAME OF INSURED | BENEFICIARY | | TYPE POLICY | |
|---|---|---|---|---|
| WILLIAMS  SPENCER | WILLIAMS  FANNIE K | | F | F |

| POLICY NUMBER | MO. | DAY | YR. | AGE* | (CENTS) WEEKLY PREMIUM | RETAIL VALUE (ADULTS) | DIST. | DEBIT |
|---|---|---|---|---|---|---|---|---|
| 2341929 | 6 | 5 | 65 | 17 | $.19 WK | $300.00 | 16 | 20 |
| | DATE OF ISSUE | | | | | | | |

*INSURED'S AGE NEXT BIRTHDAY

REGISTER OF CHANGE OF BENEFICIARY

NO CHANGE, DESIGNATION OR DECLARATION, SHALL TAKE EFFECT UNTIL ENDORSED ON THIS POLICY BY THE COMPANY AT ITS HOME OFFICE.

| DATE ENDORSED | BENEFICIARY | ENDORSED BY |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |

Service Insurance Company of Alabama having discharged each and every obligation and liability set forth and stipulated herein, the undersigned beneficiary under this policy hereby surrenders the said policy and certifies that there is held against the said company no further claims hereunder.

_____    _____
WITNESS    BENEFICIARY

Dated at _____ _____ this _____ day of _____ 19____

DEC-08 9 WED 09:18 AM    WATSON, FEES, & JIMMERSON    〈 NO. 〉 256 536 2868    P. 24

# SERVICE INSURANCE COMPANY of Alabama

Will upon receipt of satisfactory proof of the death of the Insured and the surrender of this Policy provide, subject to the terms and conditions of this Policy, a funeral for the Insured of the retail value shown in the schedule.

**CONSIDERATION**—This Policy is issued in consideration of payment in advance of the weekly premium stated in the schedule on the fourth page of this Policy on or before each Monday in every year during the lifetime of the Insured until premiums shall have been paid for fifteen years, or until prior death of the Insured. Provided, however, that if the Insured is 66 years of age or over the Premium Paying Period shall be as follows:

Age at Date of Issue.

| | |
|---|---|
| Age 66 through age 70 | Premiums Payable for 12 Years |
| Age 71 through age 75 | Premiums Payable for 10 Years |
| Age 76 through age 80 | Premiums Payable for 8 Years |
| Age 81 through age 85 | Premiums Payable for 6 Years |
| Age 86 and over | Premiums Payable for 5 Years |

The amount on which reserve is maintained and computed under this Policy is 40% of the retail value stated in this Policy or the average wholesale cost to the Company of the funeral supplies, benefits and services furnished if the same is greater than 40% of such retail value. Reserves shall be computed on the basis of the 1941 Standard Industrial Table of Mortality, Modified Preliminary Term, Illinois Standard, and interest at 3½% per annum.

**ALTERATION AND WAIVERS**—This Policy contains the entire agreement between the Company and the Insured. Its terms cannot be changed or its conditions varied, except by a written agreement, signed by the President or Secretary of the Company. No other person shall have the power to make or alter contracts, waive forfeitures, or receive premiums on policies in arrears more than four weeks, or to receipt for the same, and all such arrears given to an agent or employee shall be at the risk of those who pay them and shall not be credited upon the Policy, whether receipted or not, except as set forth in the "Reinstatement" provision herein.

**CONDITIONS AND PROVISIONS**—This Policy is issued and accepted subject to all of the terms, conditions, provisions, schedules, registers and endorsements printed or written by the Company on this or the succeeding pages hereof, which are a part of this Policy as fully as if recited over the signatures hereto affixed.

**PREMIUMS PAYABLE OTHER THAN WEEKLY**—The premium stated in the schedule of this Policy is a Weekly Premium. However, if an Annual Premium (52 weeks) is paid in advance at one time, such Annual Premium shall be calculated by multiplying the stated Weekly Premium by 46.8. If a Semi-Annual Premium (26 weeks) is paid in advance at one time, such Semi-Annual Premium shall be calculated by multiplying the Weekly Premium stated by 24.7.

**PREMIUM PAYING PERIOD**—The premium paying period shall begin with the date of issue and continue until premiums shall have been paid for the period stated in the above paragraph headed "Consideration."

**EFFECTIVE DATE**—This Policy shall take effect on its date of issue, provided the Insured is then alive and in sound health, but not otherwise.

**GRACE PERIOD**—A grace period of four weeks shall be granted for the payment of every premium after the first during which time this Policy will remain in force subject to the terms hereof, but after the expiration of the said period of grace the Company's liability under this Policy shall cease except as to the Non-Forfeiture privileges herein contained.

**REINSTATEMENT**—If this Policy shall lapse for non-payment of premium, it may be reinstated upon written application of the Insured accompanied by this Policy within one year from the date to which premiums have been duly paid, upon payment of all arrears, provided evidence of insurability of the Insured, satisfactory to the Company, be furnished, and such reinstatement shall not be effective until the date on which approval thereof is endorsed by the Company on this Policy and unless the Insured is then alive and in sound health.

IN WITNESS WHEREOF, The Company has caused this Policy to be executed by its President and Secretary at its Home Office in Birmingham, Alabama, as of the date of issue appearing in the schedule on page four hereof.

_I. L. Burleson_
SECRETARY

_J. _____
PRESIDENT

BURIAL POLICY.
PREMIUMS PAYABLE 15 YEARS.

F-6-55

DEC-08   WED 09:12 AM   WATSON, FEES & JIMMERSON   FAX NO. 1 256 536 2333   P. 25

WHEREVER IN THIS POLICY THE WORDS "RETAIL VALUE" ARE USED REFERENCE IS THEREBY MADE TO THE RETAIL PRICES OF THE COMPANY'S AUTHORIZED FUNERAL DIRECTORS

(1) The Company has contracted with and thereby appointed as an authorized funeral director the funeral director designated in this Policy and the Insured by the acceptance of this Policy confirms such appointment. Wherever the phrase "authorized funeral director" is used, it means a funeral director then under contract with this Company to furnish the merchandise and service at the time of the Insured's death.

(2) The provisions of this Policy relating to the providing of funeral merchandise and the rendering of funeral services are to be fulfilled by the Company through an authorized funeral director only and are not to be construed as implying that such funeral merchandise and funeral service will be furnished by anyone except an authorized funeral director.

(3) The authorized funeral director has contracted to keep on display at all times the funeral merchandise stipulated in and provided by this Policy and the selection of same may be made by the Insured hereunder, the beneficiary or by any other person having the authority.

(4) BENEFITS WHERE DEATH OCCURS WITHIN THIRTY-FIVE MILES OF AN AUTHORIZED FUNERAL DIRECTOR.

If death occurs within thirty-five miles of an authorized funeral director the Company will through the facilities and in the manner referred to above, provide a funeral for the Insured of the retail value stipulated herein consisting of a casket, merchandise, and services as follows:

(A) If the Insured is twelve years of age or older at death, a funeral of the retail value of $300, and if the insured is under the age of twelve years at death, a funeral of the retail value proportionate to the age of the deceased insured;

(B) A place where funeral, memorial, or other services may be held and such assistance as is proper in conducting the funeral; such services to be conducted either at the church, funeral parlor, home of the deceased, or other place designated by the beneficiary or other person having the authority;

(C) Embalming of body, suit or dress, use of one family car, and hearse service for the body to the cemetery, if desired, provided burial is within thirty-five (35) miles of place of death, or, if burial is not desired within the said thirty-five (35) miles the Company will convey the body to the depot and pay actual railway transportation thereon to any point within the United States;

(D) In the event the body is shipped to a point served by an authorized funeral director the Company will through such authorized funeral director furnish hearse service for a distance not to exceed thirty-five (35) miles from such point.

If the services of the authorized funeral director are not used, then the sole liability of the Company is limited to the furnishing through its authorized funeral director of the casket stipulated above in this Paragraph No. (4).

The Company will through the facilities and in the manner referred to above provide for a stillborn child, or a child under the age of four weeks, who dies within thirty-five (35) miles of an authorized funeral director a casket of the retail value of $15 provided both parents are insured under burial policies with the Company and that such policies are in full force and effect at the date of such birth or death.

(5) BENEFITS WHERE DEATH OCCURS MORE THAN THIRTY-FIVE MILES FROM AN AUTHORIZED FUNERAL DIRECTOR.

If the death of the Insured occurs more than thirty-five (35) miles from an authorized funeral director, the Company will, in lieu of the benefits set out in Paragraph No. (4) and upon receipt of due proof of the death of the insured, pay at its Home Office in Birmingham, Alabama, to the beneficiary named herein or to the person making arrangements for and becoming obligated to pay the burial expenses of the deceased insured, the sum of $137.50 in cash if the Insured is over one year of age, and if the Insured is under the age of one year, the sum of $68.75 in cash.

(6) POLICY CONTROL—If the Insured hereunder is a minor, during the minority of such Insured, the right to change the beneficiary and exercise all of the rights of ownership under this Policy shall be vested in the beneficiary named herein from time to time; or if such beneficiary dies before the Insured, then such rights shall be vested in the surviving parent of the Insured, or in the legal guardian of the Insured, or in any adult having the custody and control of said minor. After the Insured becomes of age, the entire ownership and control of this Policy shall be vested in the Insured.

(7) CHANGE OF BENEFICIARY—The beneficiary under this Policy may be changed from time to time by the person entitled to exercise the Policy Control. Such change shall become operative only when this Policy, accompanied by such form of request as the Company may require, has been surrendered to the Company at its Home Office and the Company has endorsed the change of beneficiary on this Policy.

(8) PAYMENT OF PREMIUM—All premiums are payable at the Home Office of the Company weekly in advance, but may be paid to an authorized representative of the Company, provided that such payment must be entered at the time in the premium receipt book belonging with this Policy. The failure of the collector to call for the premium on the Policy will not be an excuse for non-payment as the Insured will then be required to pay the premium at a Branch Office of the Company or remit the same to the Home Office.

(9) ASSIGNMENT—Neither this Policy, nor any benefit hereunder can be assigned.

(10) NON-FORFEITURE BENEFITS

Extended Insurance—In the event this Policy lapses after premiums have been paid for the respective periods shown in the table below this Policy shall be automatically continued in force as Extended Insurance for the number of months specified in such table and from the due date of the first premium in default.

Cash Surrender Value—After this Policy has been in force with premiums paid for the respective periods shown in the table below, the Insured may, by making written application and surrendering this Policy to the Company, obtain its Cash Surrender Value. If the application therefor is made within thirteen weeks of the due date of the first premium in default, the amount of such Cash Surrender Value shall be as set out in the table below, otherwise the amount shall be the equivalent of the reserve on the Extended Insurance at the date application therefor is made. The Company may defer the payment of any Cash Surrender Value for the period permitted by law, but not to exceed thirteen weeks from the date application therefor is received by the Company.

DEC-08-1999 WED 09:15 AM WATSON,FEES AMERSON FAX NO. 1 256 536 2383 23

# TABLE OF NON-FORFEITURE BENEFITS

| No. of Yrs. Premium Paid* | 5 Years | | 6 Years | | 7 Years | | 8 Years | | 9 Years | | 10 Years | | 11 Years | | 12 Years | | 13 Years | | 14 Years | | 15 Years | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Age at Issue | Extended Insurance Mos. A | Cash Value B | Extended Insurance Mos. A | Cash Value B | Extended Insurance Mos. A | Cash Value B | Extended Insurance Mos. A | Cash Value B | Extended Insurance Mos. A | Cash Value B | Extended Insurance Mos. A | Cash Value B | Extended Insurance Mos. A | Cash Value B | Extended Insurance Mos. A | Cash Value B | Extended Insurance Mos. A | Cash Value B | Extended Insurance Mos. A | Cash Value B | Extended Insurance Mos. A | Cash Value B |
| 1 | 37 | $5 | 69 | $6 | 107 | $8 | 149 | $11 | 192 | $13 | 206 | $15 | 236 | $18 | 112 | $21 | 412 | $24 | 501 | $27 | Pd. up | [illegible] |
| 2 | 30 | 5 | 84 | 7 | 114 | 9 | 161 | 11 | 210 | 13 | 251 | 16 | 300 | 19 | 457 | 21 | 421 | 21 | 547 | 27 | Pd. up | [illegible] |
| 3 | 53 | 5 | 91 | 7 | 132 | 9 | 172 | 12 | 224 | 14 | 272 | 17 | 320 | 19 | 374 | 22 | 443 | 25 | 616 | 24 | Pd. up | [illegible] |
| 4 | 71 | 6 | 112 | 8 | 150 | 10 | 192 | 12 | 242 | 15 | 291 | 17 | 340 | 20 | 472 | 23 | 453 | 25 | 643 | 25 | Pd. up | [illegible] |
| 5 | 86 | 6 | 126 | 9 | 166 | 10 | 210 | 13 | 262 | 14 | 314 | 18 | 354 | 18 | 410 | 21 | 465 | 26 | 570 | 23 | Pd. up | [illegible] |
| 6 | 94 | 6 | 136 | 9 | 176 | 11 | 225 | 13 | 273 | 16 | 323 | 18 | 358 | 21 | 417 | 24 | 473 | 27 | 521 | 30 | Pd. up | [illegible] |
| 7 | 102 | 7 | 140 | 9 | 137 | 11 | 237 | 14 | 284 | 16 | 332 | 19 | 377 | 21 | 423 | 31 | 474 | 27 | 514 | 30 | Pd. up | [illegible] |
| 8 | 106 | 7 | 147 | 9 | 150 | 12 | 210 | 14 | 292 | 16 | 337 | 19 | 381 | 22 | 427 | 25 | 463 | 27 | 510 | 31 | Pd. up | [illegible] |
| 9 | 109 | 7 | 160 | 9 | 152 | 12 | 244 | 14 | 294 | 17 | 338 | 19 | 381 | 22 | 420 | 25 | 462 | 24 | 503 | 31 | Pd. up | [illegible] |
| 10 | 111 | 7 | 162 | 10 | 156 | 12 | 218 | 14 | 230 | 17 | 332 | 20 | 374 | 23 | 411 | 25 | 454 | 28 | 496 | 32 | Pd. up | [illegible] |
| 11 | 113 | 7 | 166 | 10 | 199 | 12 | 214 | 15 | 284 | 17 | 327 | 20 | 367 | 23 | 409 | 26 | 416 | 29 | 534 | 32 | Pd. up | [illegible] |
| 12 | 113 | 8 | 167 | 10 | 199 | 12 | 259 | 15 | 280 | 18 | 320 | 20 | 361 | 23 | 401 | 26 | 410 | 29 | 482 | 33 | Pd. up | [illegible] |
| 13 | 117 | 8 | 168 | 10 | 194 | 13 | 233 | 15 | 271 | 18 | 314 | 21 | 355 | 21 | 394 | 27 | 433 | 30 | 472 | 33 | Pd. up | [illegible] |
| 14 | 118 | 8 | 163 | 10 | 189 | 13 | 228 | 15 | 269 | 18 | 309 | 21 | 349 | 23 | 356 | 27 | 425 | 30 | 461 | 34 | Pd. up | [illegible] |
| 15 | 116 | 8 | 149 | 11 | 185 | 13 | 223 | 16 | 263 | 19 | 302 | 22 | 343 | 25 | 381 | 23 | 418 | 31 | 456 | 35 | Pd. up | [illegible] |
| 16 | 112 | 8 | 145 | 11 | 181 | 13 | 219 | 16 | 259 | 19 | 299 | 22 | 336 | 25 | 373 | 28 | 418 | 32 | 418 | 36 | Pd. up | [illegible] |
| 17 | 108 | 8 | 141 | 11 | 176 | 14 | 215 | 16 | 254 | 19 | 293 | 22 | 330 | 26 | 363 | 29 | 472 | 32 | 410 | 36 | Pd. up | [illegible] |
| 18 | 105 | 9 | 139 | 11 | 174 | 14 | 212 | 17 | 250 | 20 | 288 | 22 | 326 | 26 | 360 | 29 | 431 | 33 | 432 | 37 | Pd. up | [illegible] |
| 19 | 103 | 9 | 135 | 11 | 171 | 14 | 208 | 17 | 247 | 20 | 283 | 23 | 319 | 27 | 351 | 30 | 384 | 31 | 421 | 37 | Pd. up | [illegible] |
| 20 | 100 | 9 | 133 | 12 | 163 | 15 | 206 | 17 | 243 | 21 | 279 | 24 | 313 | 27 | 316 | 31 | 360 | 31 | 417 | 38 | Pd. up | [illegible] |
| 21 | 98 | 9 | 131 | 12 | 167 | 15 | 202 | 18 | 239 | 21 | 274 | 24 | 306 | 28 | 311 | 31 | 373 | 35 | 409 | 39 | Pd. up | [illegible] |
| 22 | 96 | 9 | 130 | 12 | 165 | 15 | 201 | 18 | 236 | 21 | 269 | 26 | 302 | 28 | 334 | 32 | 365 | 35 | 401 | 40 | Pd. up | [illegible] |
| 23 | 96 | 10 | 129 | 12 | 163 | 15 | 194 | 19 | 232 | 22 | 265 | 25 | 297 | 29 | 337 | 33 | 369 | 36 | 394 | 40 | Pd. up | [illegible] |
| 24 | 95 | 10 | 123 | 13 | 162 | 16 | 196 | 19 | 230 | 22 | 260 | 26 | 271 | 29 | 320 | 33 | 351 | 37 | 385 | 41 | Pd. up | [illegible] |
| 25 | 95 | 10 | 127 | 13 | 160 | 16 | 194 | 19 | 226 | 23 | 257 | 26 | 280 | 30 | 315 | 34 | 344 | 38 | 375 | 42 | Pd. up | [illegible] |
| 26 | 94 | 10 | 126 | 13 | 159 | 16 | 191 | 20 | 221 | 22 | 251 | 27 | 280 | 31 | 305 | 35 | 337 | 39 | 369 | 43 | Pd. up | [illegible] |
| 27 | 94 | 10 | 125 | 13 | 157 | 17 | 188 | 20 | 220 | 21 | 247 | 27 | 275 | 31 | 301 | 35 | 325 | 40 | 361 | 44 | Pd. up | [illegible] |
| 28 | 92 | 11 | 121 | 14 | 155 | 17 | 185 | 21 | 215 | 21 | 242 | 25 | 265 | 32 | 296 | 36 | 321 | 40 | 351 | 45 | Pd. up | [illegible] |
| 29 | 93 | 11 | 123 | 14 | 155 | 18 | 183 | 21 | 211 | 25 | 234 | 29 | 263 | 33 | 287 | 37 | 311 | 41 | 316 | 46 | Pd. up | [illegible] |
| 30 | 93 | 11 | 122 | 14 | 155 | 18 | 180 | 22 | 207 | 25 | 232 | 29 | 257 | 33 | 232 | 38 | 306 | 42 | 338 | 47 | Pd. up | [illegible] |
| 31 | 93 | 11 | 121 | 15 | 150 | 18 | 177 | 22 | 202 | 26 | 228 | 30 | 251 | 31 | 275 | 39 | 301 | 43 | 329 | 48 | Pd. up | [illegible] |
| 32 | 92 | 12 | 121 | 15 | 148 | 19 | 174 | 23 | 199 | 27 | 222 | 31 | 245 | 32 | 263 | 39 | 293 | 44 | 322 | 49 | Pd. up | [illegible] |
| 33 | 92 | 12 | 119 | 15 | 145 | 19 | 171 | 23 | 194 | 27 | 217 | 31 | 239 | 36 | 262 | 40 | 285 | 45 | 313 | 50 | Pd. up | [illegible] |
| 34 | 90 | 12 | 117 | 16 | 142 | 20 | 167 | 24 | 191 | 25 | 212 | 32 | 233 | 37 | 255 | 41 | 277 | 46 | 306 | 51 | Pd. up | [illegible] |
| 35 | 90 | 12 | 115 | 16 | 140 | 20 | 164 | 24 | 185 | 22 | 206 | 33 | 227 | 37 | 248 | 42 | 270 | 47 | 297 | 52 | Pd. up | [illegible] |
| 36 | 88 | 13 | 113 | 17 | 138 | 21 | 160 | 25 | 181 | 29 | 201 | 34 | 221 | 38 | 240 | 43 | 262 | 48 | 290 | 53 | Pd. up | [illegible] |
| 37 | 87 | 13 | 112 | 17 | 134 | 21 | 156 | 26 | 176 | 30 | 195 | 34 | 214 | 39 | 233 | 44 | 255 | 49 | 281 | 55 | Pd. up | [illegible] |
| 38 | 86 | 13 | 109 | 17 | 131 | 22 | 151 | 26 | 171 | 30 | 190 | 35 | 208 | 40 | 227 | 45 | 214 | 51 | 271 | 56 | Pd. up | [illegible] |
| 39 | 84 | 14 | 106 | 18 | 123 | 22 | 148 | 27 | 166 | 31 | 181 | 36 | 201 | 41 | 220 | 46 | 239 | 52 | 264 | 57 | Pd. up | [illegible] |
| 40 | 82 | 14 | 104 | 19 | 124 | 23 | 143 | 27 | 161 | 32 | 178 | 37 | 194 | 42 | 212 | 47 | 232 | 54 | 267 | 58 | Pd. up | [illegible] |
| 41 | 81 | 14 | 101 | 19 | 121 | 23 | 139 | 28 | 156 | 33 | 172 | 38 | 183 | 43 | 205 | 48 | 224 | 54 | 218 | 60 | Pd. up | [illegible] |
| 42 | 78 | 15 | 98 | 19 | 117 | 24 | 131 | 28 | 151 | 33 | 167 | 38 | 182 | 44 | 198 | 49 | 217 | 55 | 210 | 61 | Pd. up | [illegible] |
| 43 | 77 | 15 | 96 | 20 | 113 | 24 | 120 | 29 | 145 | 31 | 160 | 39 | 176 | 45 | 191 | 50 | 210 | 56 | 222 | 62 | Pd. up | [illegible] |
| 44 | 74 | 16 | 92 | 20 | 109 | 26 | 121 | 30 | 140 | 35 | 154 | 40 | 169 | 46 | 184 | 51 | 202 | 57 | 225 | 62 | Pd. up | [illegible] |
| 45 | 71 | 16 | 89 | 20 | 105 | 27 | 120 | 30 | 134 | 36 | 147 | 41 | 162 | 47 | 177 | 52 | 194 | 58 | 211 | 64 | Pd. up | [illegible] |
| 46 | 69 | 16 | 86 | 21 | 102 | 26 | 115 | 31 | 129 | 36 | 142 | 42 | 136 | 43 | 170 | 53 | 180 | 66 | 205 | 66 | Pd. up | |
| 47 | 68 | 16 | 83 | 21 | 97 | 26 | 110 | 32 | 124 | 37 | 137 | 43 | 119 | 48 | 163 | 64 | 179 | 61 | 201 | 67 | Pd. up | |
| 48 | 65 | 17 | 79 | 22 | 93 | 27 | 106 | 32 | 117 | 38 | 131 | 43 | 143 | 49 | 157 | 55 | 172 | 62 | 193 | 69 | Pd. up | |
| 49 | 62 | 17 | 76 | 22 | 89 | 27 | 102 | 33 | 113 | 38 | 125 | 41 | 137 | 60 | 149 | 66 | 165 | 63 | 185 | 70 | Pd. up | |
| 50 | 59 | 17 | 73 | 23 | 86 | 28 | 97 | 33 | 108 | 39 | 119 | 45 | 131 | 51 | 142 | 57 | 157 | 64 | 173 | 71 | Pd. up | |
| 51 | 57 | 18 | 69 | 23 | 81 | 28 | 92 | 34 | 108 | 40 | 117 | 46 | 124 | 68 | 136 | 63 | 130 | 62 | 170 | 72 | Pd. up | |
| 52 | 54 | 18 | 67 | 23 | 77 | 29 | 87 | 34 | 98 | 40 | 108 | 46 | 113 | 53 | 130 | 59 | 143 | 66 | 162 | 73 | Pd. up | |
| 53 | 51 | 18 | 63 | 24 | 74 | 29 | 83 | 34 | 93 | 11 | 103 | 47 | 112 | 51 | 122 | 60 | 134 | 67 | 155 | 74 | Pd. up | |
| 54 | 49 | 19 | 59 | 24 | 69 | 30 | 79 | 36 | 88 | 42 | 97 | 48 | 106 | 54 | 116 | 61 | 129 | 68 | 148 | 76 | Pd. up | |
| 55 | 46 | 19 | 57 | 24 | 66 | 30 | 75 | 36 | 82 | 42 | 92 | 43 | 100 | 66 | 110 | 62 | 122 | 69 | 140 | 77 | Pd. up | |
| 56 | 44 | 19 | 53 | 25 | 62 | 31 | 78 | 37 | 73 | 43 | 86 | 47 | 95 | 66 | 104 | 63 | 114 | 70 | 133 | 78 | Pd. up | |
| 57 | 41 | 19 | 50 | 25 | 69 | 31 | 66 | 37 | 71 | 43 | 81 | 60 | 89 | 66 | 99 | 63 | 109 | 71 | 126 | 79 | Pd. up | |
| 58 | 39 | 20 | 47 | 26 | 55 | 31 | 62 | 37 | 69 | 41 | 76 | 60 | 84 | 57 | 92 | 64 | 101 | 72 | 120 | 80 | Pd. up | |
| 59 | 36 | 20 | 44 | 26 | 51 | 32 | 59 | 38 | 65 | 44 | 71 | 61 | 78 | 68 | 86 | 65 | 97 | 72 | 113 | 81 | Pd. up | |
| 60 | 34 | 20 | 41 | 26 | 49 | 32 | 54 | 38 | 60 | 45 | 67 | 61 | 73 | 68 | 81 | 66 | 91 | 73 | 104 | 81 | Pd. up | |
| 61 | 32 | 20 | 39 | 26 | 45 | 32 | 50 | 33 | 57 | 15 | 62 | 51 | 64 | 58 | 76 | 66 | 85 | 71 | 100 | 82 | Pd. up | |
| 62 | 30 | 20 | 36 | 26 | 41 | 33 | 47 | 39 | 62 | 45 | 68 | 52 | 61 | 59 | 70 | 68 | 79 | 74 | 94 | 83 | Pd. up | |
| 63 | 28 | 21 | 33 | 27 | 39 | 33 | 44 | 39 | 19 | 45 | 64 | 52 | 57 | 59 | 65 | 67 | 74 | 75 | 87 | 84 | Pd. up | |
| 64 | 26 | 21 | 31 | 27 | 36 | 33 | 41 | 39 | 16 | 45 | 60 | 52 | 55 | 60 | 60 | 67 | 65 | 76 | 81 | 84 | Pd. up | |
| 65 | 21 | 21 | 29 | 27 | 33 | 33 | 35 | 39 | 43 | 44 | 46 | 62 | 54 | 69 | 66 | 67 | 61 | [illegible] | 76 | 85 | Pd. up | |
| 66 | 30 | 21 | 33 | 27 | 37 | 33 | 43 | 39 | 44 | 46 | 54 | 62 | 63 | 60 | Pd. up | 67 | | 76 | | 86 | | |
| 67 | 27 | 21 | 31 | 27 | 31 | 33 | 39 | 39 | 11 | 46 | 50 | 52 | 56 | 63 | Pd. up | 67 | | 76 | | 86 | | |
| 68 | 24 | 21 | 29 | 27 | 32 | 33 | 36 | 39 | 41 | 46 | 16 | 52 | 51 | 60 | Pd. up | 68 | | 76 | | 86 | | |
| 69 | 23 | 21 | 27 | 27 | 29 | 33 | 32 | 33 | 39 | 46 | 43 | 52 | 48 | 69 | Pd. up | 65 | | 77 | | 87 | | |
| 70 | 21 | 21 | 25 | 27 | 28 | 33 | 31 | 33 | 36 | 46 | 40 | 52 | 44 | 60 | Pd. up | 68 | | 77 | | 87 | | |
| 71 | 21 | 25 | 23 | 31 | 26 | 37 | 40 | 43 | 33 | 49 | Pd. up | 55 | | 62 | | 70 | | 78 | | 83 | | |
| 72 | 20 | 26 | 22 | 31 | 21 | 37 | 27 | 43 | 32 | 49 | Pd. up | 56 | | 63 | | 70 | | 78 | | 83 | | |
| 73 | 18 | 26 | 21 | 32 | 22 | 38 | 25 | 44 | 29 | 50 | Pd. up | [illegible] | | 63 | | 70 | | 79 | | 83 | | |
| 74 | 16 | 26 | 19 | 32 | 21 | 28 | 23 | 44 | 27 | 64 | Pd. up | 57 | | 65 | | 70 | | 79 | | 83 | | |
| 75 | 15 | 27 | 18 | 33 | 20 | 29 | 22 | 45 | 21 | 51 | Pd. up | 57 | | 61 | | 71 | | 79 | | 83 | | |
| 76 | 14 | 25 | 16 | 34 | 18 | 40 | Pd. up | 44 | | 52 | | 58 | | 68 | | 72 | | 77 | | 89 | | |
| 77 | 13 | 23 | 14 | 35 | 16 | 41 | Pd. up | 47 | | 51 | | 60 | | 66 | | 73 | | 80 | | 89 | | |
| 78 | 12 | 30 | 14 | 36 | 14 | 43 | Pd. up | 49 | | 56 | | 62 | | 62 | | 71 | | 80 | | 89 | | |
| 79 | 12 | 31 | 13 | 38 | 13 | 45 | Pd. up | 51 | | 68 | | 64 | | 69 | | 75 | | 82 | | 89 | | |
| 80 | 11 | 33 | 12 | 10 | 12 | 47 | Pd. up | 54 | | 60 | | 66 | | 72 | | 74 | | 83 | | 89 | | |
| 81 | 10 | 34 | Pd. up | 42 | | 49 | | 56 | | 62 | | 69 | | [illegible] | | 80 | | 81 | | 80 | | |
| 82 | 8 | 36 | Pd. up | 44 | | 51 | | 58 | | 65 | | 71 | | 77 | | 82 | | 87 | | 102 | | |
| 83 | 5 | 38 | Pd. up | 46 | | 54 | | 61 | | 68 | | 71 | | 79 | | 91 | | 101 | | | | |
| 84 | 7 | 40 | Pd. up | 48 | | 56 | | 64 | | 70 | | 76 | | 81 | | 100 | | | | | | |
| 85 | 6 | 42 | Pd. up | 51 | | 59 | | 66 | | 72 | | 75 | | 79 | | | | | | | | |
| 86 | Pd. up | 44 | | 53 | | 61 | | 68 | | 71 | | 76 | | | | | | | | | | |
| 87 | Pd. up | 47 | | 56 | | 63 | | 69 | | 74 | | | | | | | | | | | | |
| 88 | Pd. up | 42 | | 57 | | 64 | | 72 | | | | | | | | | | | | | | |
| 89 | Pd. up | 50 | | 58 | | 69 | | | | | | | | | | | | | | | | |
| 90 | Pd. up | 51 | | 85 | | | | | | | | | | | | | | | | | | |

*Premiums must have been paid on this Policy for the number of years indicated in the first line of the foregoing table to obtain the benefits indicated. See paragraph

F—6-55

—3—



**G**



**SERVICE INSURANCE COMPANY**
*of Alabama*

Division of LIBERTY NATIONAL LIFE INSURANCE CO.
Birmingham, Alabama

**FUNERAL POLICY**

WEEKLY PREMIUMS PAYABLE FOR 12 YEARS

BENEFIT FOR ACCIDENTAL DEATH

NONPARTICIPATING INDUSTRIAL POLICY

SCHEDULE

| NAME OF INSURED | | | | BENEFICIARY | | | TYPE 330 |
|---|---|---|---|---|---|---|---|
| LLIAMS SPENCER | | | | WILLIAMS FANNIE | | PREMIUMS PAYABLE W K | 3 3 0 |
| | 11 24 69 | | | | | 7 1 2 | 1 5 |
| | MO. DAY YR. DATE OF ISSUE | AGE LAST BIRTHDAY AT DATE OF ISSUE 2 1 | (CENTS) WEEKLY PREMIUM 0 2 3 | RETAIL VALUE $300 | | DISTRICT | AGENCY |
| POLICY NUMBER 1 4 7 5 0 5 5 3 | | | | | | | |

h prior to age ten, the retail value is a reduced amount providing comparable benefits.

...TY NATIONAL LIFE INSURANCE COMPANY
BIRMINGHAM, ALABAMA

PAID-UP POLICY CERTIFICATE

DATE 11 28 88

| OF INSURED | TYPE | POLICY NO. | ISSUE DATE | | | FACE AMT. | ISSUE AGE | PREMIUM | DUE PAID TO | | PAID OUT DATE | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | MO. | DAY | YR. | | | | YR. | DAY | YR. | DAY | YR. |
| S NGTA A | 330 | XX7000UU | 11 | 24 | 69 | 25 13 | 14 13 | 7 01 | 11 | 9 01 | | | |

ON PAYMENT OF FULL

**×××××××× ××**

NET OVER-PAYMENT
FOR WHICH A
CHECK IS ENCLOSED

THIS IS TO CERTIFY THAT THE POLICY DESCRIBED
ABOVE IS NOW PAID-UP FOR LIFE AND NO MORE
PREMIUMS WILL BE DUE.

LIBERTY NATIONAL LIFE INSURANCE CO.

*Joseph A. Kowalski*
SECRETARY

THIS CERTIFICATE SHOULD BE
ATTACHED TO THE POLICY
IT DESCRIBES

• SEE REVERSE SIDE •

**H**



*80—4-07

# LIBERTY NATIONAL
## LIFE INSURANCE COMPANY
Birmingham, Alabama

## ACCIDENT POLICY

BENEFIT FOR DEATH BY ACCIDENTAL MEANS

BENEFIT FOR DEATH BY AUTOMOBILE ACCIDENT

BENEFIT FOR DEATH BY TRAVEL ACCIDENT

BENEFIT FOR DEATH IMMEDIATELY PRECEDING INSURED'S 70TH BIRTHDAY

PREMIUMS PAYABLE UNTIL POLICY ANNIVERSARY IMMEDIATELY PRECEDING INSURED'S 70TH BIRTHDAY

THIS POLICY IS NONCANCELLABLE AND GUARANTEED RENEWABLE UNTIL THE POLICY ANNIVERSARY IMMEDIATELY PRECEDING INSURED'S 70TH BIRTHDAY

NONPARTICIPATING INDUSTRIAL POLICY

## SCHEDULE

| POLICY NUMBER | NAME OF INSURED | BENEFICIARY | TYPE 590-890 |
|---|---|---|---|

| Month Day Year DATE OF ISSUE AGE | PREMIUM | AMOUNT OF INSURANCE | Month Day Year LAST PREMIUM PAYABLE | AGENCY | DISTRICT |
|---|---|---|---|---|---|

Amount of insurance benefits shown on page one

DEC '99  12:53AM WATSON FEES JEFFERSON                    P.8/19



BURIAL POLICY

SERVICE of Alabama
INSURANCE COMPANY
BIRMINGHAM, ALA.

PREMIUM PAYABLE FOR
YEARS

READ YOUR POLICY

AUTHORIZED [UNDERTAKER

F-6-55

## SCHEDULE                                                    DUPLICATE

| NAME OF INSURED | BENEFICIARY | TYPE POLICY |
|---|---|---|
| WILLIAMS  NETA A | WILLIAMS  FANNIE K | F  F |

| POLICY NUMBER | DATE OF ISSUE | | | AGE† | (CENTS) WEEKLY PREMIUM | RETAIL VALUE (ADULT) | DIST. | DIGIT |
|---|---|---|---|---|---|---|---|---|
| 2341930 | 4 MO. | 5 DAY | 68 YR. | 9 | 3.16 | $300.00 | 36 | 20 |

†INSURED'S AGE NEXT BIRTHDAY

### REGISTER OF CHANGE OF BENEFICIARY

NOTE—NO CHANGE, DESIGNATION OR DECLARATION, SHALL TAKE EFFECT UNTIL ENDORSED ON THIS POLICY BY THE COMPANY AT ITS HOME OFFICE.

| DATE ENDORSED | BENEFICIARY | ENDORSED BY |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |

Service Insurance Company of Alabama having discharged each and every obligation and liability set forth and stipulated herein, the undersigned beneficiary under this policy hereby surrenders the said policy and certifies that there is held against the said company no further claims hereunder.

_____          _____
WITNESS                                    BENEFICIARY

Dated at_____this_____day of_____19___

# SERVICE
## INSURANCE COMPANY
## of Alabama

Will upon receipt of satisfactory proof of the death of the Insured and the surrender of this Policy provide, subject to the terms and conditions of this Policy, a funeral for the Insured of the retail value shown in the schedule.

**CONSIDERATION**—This Policy is issued in consideration of payment in advance of the weekly premium stated in the schedule on the fourth page of this Policy on or before each Monday in every year during the lifetime of the Insured until premiums shall have been paid for fifteen years, or until prior death of the Insured. Provided, however, that if the Insured is 66 years of age or over, the Premium Paying Period shall be as follows:

Age at Date of Issue.

| Age 66 through age 70 | Premiums Payable for 12 Years |
| Age 71 through age 75 | Premiums Payable for 10 Years |
| Age 76 through age 80 | Premiums Payable for 8 Years |
| Age 81 through age 85 | Premiums Payable for 6 Years |
| Age 86 and over | Premiums Payable for 5 Years |

The amount on which reserve is maintained and computed under this Policy is 40% of the retail value stated in this Policy or the average wholesale cost to the Company of the funeral supplies, benefits and services furnished if the same is greater than 40% of such retail value. Reserves shall be computed on the basis of the 1941 Standard Industrial Table of Mortality, Modified Preliminary Term, Illinois Standard, and interest at 3¼% per annum.

**ALTERATION AND WAIVERS**—This Policy contains the entire agreement between the Company and the Insured. Its terms cannot be changed or its conditions varied, except by a written agreement signed by the President or Secretary of the Company. No other person shall have the power to make or alter contracts, waive forfeitures, or receive premiums on policies in arrears more than four weeks, or to receipt for the same, and all such arrears given to an agent or employee shall be at the risk of those who pay them and shall not be credited upon the Policy, whether receipted or not, except as set forth in the "Reinstatement" provision herein.

**CONDITIONS AND PROVISIONS**—This Policy is issued and accepted subject to all of the terms, conditions, provisions, schedules, registers and endorsements printed or written by the Company on this or the succeeding pages hereof, which are a part of this Policy as fully as if recited over the signatures hereto affixed.

**PREMIUMS PAYABLE OTHER THAN WEEKLY**—The premium stated in the schedule of this Policy is a Weekly Premium. However, if an Annual Premium (52 weeks) is paid in advance at one time, such Annual Premium shall be calculated by multiplying the stated Weekly Premium by 45.3. If a Semi-Annual Premium (26 weeks) is paid in advance at one time, such Semi-Annual Premium shall be calculated by multiplying the Weekly Premium stated by 24.7.

**PREMIUM PAYING PERIOD**—The premium paying period shall begin with the date of issue and continue until premiums shall have been paid for the period stated in the above paragraph headed "Consideration."

**EFFECTIVE DATE**—This Policy shall take effect on its date of issue, provided the Insured is then alive and in sound health, but not otherwise.

**GRACE PERIOD**—A grace period of four weeks shall be granted for the payment of every premium after the first during which time this Policy will remain in force subject to the terms hereof, but after the expiration of the said period of grace the Company's liability under this Policy shall cease except as to the Non-Forfeiture privileges herein contained.

**REINSTATEMENT**—If this Policy shall lapse for non-payment of premium, it may be reinstated upon written application of the Insured accompanied by this Policy within one year from the date to which premiums have been duly paid, upon payment of all arrears, provided evidence of insurability of the Insured, satisfactory to the Company, be furnished, and such reinstatement shall not be effective until the date on which approval thereof is endorsed by the Company on this Policy and unless the Insured is then alive and in sound health.

IN WITNESS WHEREOF, The Company has caused this Policy to be executed by its President and Secretary at its Home Office in Birmingham, Alabama, as of the date of issue appearing in the schedule on page four hereof.

_____
SECRETARY

_____
PRESIDENT

BURIAL POLICY.
PREMIUMS PAYABLE 15 YEARS.

OF  3 '99  11:31AM WATSON FEES JIMMERSON                              P.12/19

WHEREVER IN THIS POLICY THE WORDS "RETAIL VALUE" ARE USED REFERENCE IS THEREBY MADE TO THE RETAIL PRICES OF THE COMPANY'S AUTHORIZED FUNERAL DIRECTORS.

(1)  The Company has contracted with and thereby appointed as an authorized funeral director the funeral director designated in this Policy and the Insured by the acceptance of this Policy confirms such appointment. Wherever the phrase "authorized funeral director" is used, it means a funeral director then under contract with this Company to furnish the merchandise and service at the time of the Insured's death.

(2)  The provisions of this Policy relating to the providing of funeral merchandise and the rendering of funeral services are to be fulfilled by the Company through an authorized funeral director only and are not to be construed as implying that such funeral merchandise and funeral service will be furnished by anyone except an authorized funeral director.

(3)  The authorized funeral director has contracted to keep on display at all times the funeral merchandise stipulated in and provided by this Policy and the selection of same may be made by the Insured hereunder, the beneficiary or by any other person having the authority.

(4)  BENEFITS WHERE DEATH OCCURS WITHIN THIRTY-FIVE MILES OF AN AUTHORIZED FUNERAL DIRECTOR.

If death occurs within thirty-five miles of an authorized funeral director the Company will through the facilities and in the manner referred to above, provide a funeral for the Insured of the retail value stipulated herein consisting of a casket, merchandise, and services as follows:

(A)  If the Insured is twelve years of age or older at death, a funeral of the retail value of $300, and if the Insured is under the age of twelve years at death, a funeral of the retail value proportionate to the age of the deceased insured;

(B)  A place where funeral, memorial, or other services may be held and such assistance as is proper in conducting the funeral; such services to be conducted either at the church, funeral parlor, home of the deceased, or other place designated by the beneficiary or other person having the authority;

(C)  Embalming of body, suit or dress, use of one family car, and hearse service for the body to the cemetery, if desired, provided burial is within thirty-five (35) miles of place of death, or, if burial is not desired within the said thirty-five (35) miles the Company will convey the body to the depot and pay actual railway transportation thereon to any point within the United States;

(D)  In the event the body is shipped to a point served by an authorized funeral director the Company will through such authorized funeral director furnish hearse service for a distance not to exceed thirty-five (35) miles from such point.

If the services of the authorized funeral director are not used, then the sole liability of the Company is limited to the furnishing through its authorized funeral director of the casket stipulated above in this Paragraph No. (4).

The Company will through the facilities and in the manner referred to above provide for a stillborn child, or a child under the age of four weeks, who dies within thirty-five (35) miles of an authorized funeral director a casket of the retail value of $15 provided both parents are insured under burial policies with the Company and that such policies are in full force and effect at the date of such birth or death.

(5)  BENEFITS WHERE DEATH OCCURS MORE THAN THIRTY-FIVE MILES FROM AN AUTHORIZED FUNERAL DIRECTOR.

If the death of the Insured occurs more than thirty-five (35) miles from an authorized funeral director, the Company will, in lieu of the benefits set out in Paragraph No. (4) and upon receipt of due proof of the death of the Insured, pay at its Home Office in Birmingham, Alabama, to the beneficiary named herein or to the person making arrangements for and becoming obligated to pay the burial expenses of the deceased Insured, the sum of $137.50 in cash if the Insured is over one year of age, and if the Insured is under the age of one year, the sum of $68.75 in cash.

(6)  POLICY CONTROL—If the Insured hereunder is a minor, during the minority of such Insured, the right to change the beneficiary and exercise all of the rights of ownership under this Policy shall be vested in the beneficiary named herein from time to time; or if such beneficiary dies before the Insured, then such rights shall be vested in the surviving parent of the Insured, or in the legal guardian of the Insured, or in any adult having the custody and control of said minor. After the Insured becomes of age, the entire ownership and control of this Policy, shall be vested in the Insured.

(7)  CHANGE OF BENEFICIARY—The beneficiary under this Policy may be changed from time to time by the person entitled to exercise the Policy Control. Such change shall become operative only when this Policy, accompanied by such form of request as the Company may require, has been surrendered to the Company at its Home Office and the Company has endorsed the change of beneficiary on this Policy.

(8)  PAYMENT OF PREMIUM—All premiums are payable at the Home Office of the Company weekly in advance, but may be paid to an authorized representative of the Company, provided that each payment must be entered at the time in the premium receipt book belonging with this Policy. The failure of the collector to call for the premium on the Policy will not be an excuse for non-payment as the Insured will then be required to pay the premium at a Branch Office of the Company or remit the same to the Home Office.

(9)  ASSIGNMENT—Neither this Policy, nor any benefit hereunder can be assigned.

(10)  NON-FORFEITURE BENEFITS

Extended Insurance—In the event this Policy lapses after premiums have been paid for the respective periods shown in the table below this Policy shall be automatically continued in force as Extended Insurance for the number of months specified in such table and from the due date of the first premium in default.

Cash Surrender Value—After this Policy has been in force with premiums paid for the respective periods shown in the table below, the Insured may, by making written application and surrendering this Policy to the Company, obtain a Cash Surrender Value. If the application therefor is made within thirteen weeks of the due date of the first premium in default, the amount of such Cash Surrender Value shall be as set out in the table below, otherwise the amount shall be the equivalent of the reserve on the Extended Insurance at the date application therefor is made. The Company may defer the payment of any Cash Surrender Value for the period permitted by law, but not to exceed thirteen weeks from the date application therefor is received by the Company.

—2—

'99  11:22AM WATSON FEES JEFFERSON

P.11/19

## TABLE OF NON-FORFEITURE BENEFITS

*The table here is illegible due to image quality.*

DEC 28 '99  11:23AM WAT    FEES JEMFERSON                                      P.12/19.



# LIBERTY NATIONAL LIFE INSURANCE COMPANY
### BIRMINGHAM, ALABAMA

## PAID-UP POLICY CERTIFICATE

DATE 11 | 23 | 81

| NAME OF INSURED | TYPE | POLICY NO. | ISSUE DATE MO DAY YR. | DISTRICT | ACCT | AGE AT ISSUE | AGE PREMIUM | DATE PAID TO MO DAY YR. | PAYOFF DATE MO DAY YR. |
|---|---|---|---|---|---|---|---|---|---|
| WILLIAMS NETA A | 330 | 1478505 | 11 24 69 | 36 | 26 | 13 | 10 11 9 | 01 11 9 | 01 |

AMOUNT OF FREE
***** ** **

THIS IS TO CERTIFY THAT THE POLICY DESCRIBED
ABOVE IS NOW PAID-UP FOR LIFE, AND NO MORE
PREMIUMS WILL BE DUE.

NET OVERPAYMENT -
FOR WHICH A
CHECK IS ENCLOSED

LIBERTY NATIONAL LIFE INSURANCE CO.

Joseph M. Kosaik

SECRETARY

THIS CERTIFICATE SHOULD BE
ATTACHED TO THE POLICY
IT DESCRIBES

• SEE REVERSE SIDE •

SERVICE INSURANCE COMPANY
of Alabama
A LIBERTY NATIONAL LIFE INSURANCE CO.
Birmingham, Alabama

FUNERAL POLICY

WEEKLY PREMIUMS PAYABLE FOR 15 YEARS

BENEFIT FOR ACCIDENTAL DEATH

NONPARTICIPATING INDUSTRIAL POLICY

## SCHEDULE

| NAME OF INSURED | BENEFICIARY | PREMIUMS PAYABLE | TYPE 330 |
|---|---|---|---|
| WILLIAMS NETA A | WILLIAMS FANNIE | WK | 330 |

| 14758555 | 11 24 69 | 13 | 018 | $300 | 712 | 15 |
|---|---|---|---|---|---|---|
| POLICY NUMBER | MO. DAY YR. DATE OF ISSUE | AGE LAST BIRTHDAY AT DATE OF ISSUE | (CENTS) WEEKLY PREMIUM | RETAIL VALUE* | DISTRICT | AGENCY |

*For death prior to age ten, the retail value is a reduced amount providing comparable benefits.

## REGISTER OF CHANGE OF BENEFICIARY

NOTE—NO CHANGE, DESIGNATION OR DECLARATION, SHALL TAKE EFFECT UNTIL ENDORSED ON THIS POLICY BY THE COMPANY AT ITS HOME OFFICE.

| DATE ENDORSED | BENEFICIARY | ENDORSED BY |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

Service Insurance Company of Alabama, Division of Liberty National Life Insurance Company, having discharged each and every obligation and liability set forth and stipulated herein, the undersigned beneficiary under this policy hereby surrenders the said policy and certifies that there is held against the said company no further claims hereunder.

_____     _____
WITNESS                                    BENEFICIARY

Dated at_____this_____day of_____19_____

9 '99  11:26AM WATSON FEES JEFFERSON                                    P. 15/19

# SERVICE INSURANCE COMPANY
## *of Alabama*

### DIVISION OF LIBERTY NATIONAL LIFE INSURANCE COMPANY

**INSURANCE AGREEMENT**—Subject to the terms and conditions of this policy we insure your life for the purpose of providing at your death the funeral benefit described below. This insurance is effective on the date of issue shown in the schedule on Page 4 if you are in good health on that date and if premiums are paid as provided under "Premiums".

**AUTHORIZED FUNERAL DIRECTOR**—We have authorized various funeral directors throughout Alabama to furnish the funeral benefit provided by this policy, and such benefit is to be furnished only by an authorized funeral director. As used in this policy "Authorized Funeral Director" means a funeral director authorized us at the time of your death. "Retail Value", as used in this policy, refers to the retail prices charged by authorized funeral directors. We will furnish you upon request the names and addresses of all authorized funeral directors.

**FUNERAL BENEFIT**—If your death occurs within the State of Alabama and within 35 miles of an authorized funeral director, we will provide for you, through an authorized funeral director, a funeral of the retail value of $300 (or in the event your death occurs prior to your tenth birthday, a funeral of a reduced retail value providing comparable benefits). The funeral shall include the following:

Casket and suit or dress.

Transportation of remains to funeral home (not to exceed 35 miles).

Embalming and preparation of remains.

Use of funeral parlor.

A place where the funeral service may be held.

Assistance in conducting the funeral service.

Use of funeral coach for transportation of remains to church, home, cemetery, railway station, or other point within 35 miles of funeral home.

Railway transportation of remains to any point within the continental United States (not including Alaska or Hawaii).

In the event remains are shipped to a point served by an authorized funeral director, funeral coach service by such funeral director for a distance not to exceed 35 miles from such point.

Neither we nor any authorized funeral director shall be liable for any expense in connection with merchandise or service furnished by anyone other than an authorized funeral director. If the services of an authorized funeral director are not used, our sole liability under this provision shall be to furnish the casket called for in this provision.

If at your death you are insured by the company under another burial policy providing for a funeral of the retail value of $250 or $300, we will in lieu of furnishing the funeral benefit specified in this policy and the other policy, furnish for you a funeral of the retail value of $600 including a metal casket.

**BENEFIT WHERE FUNERAL BENEFIT NOT AVAILABLE**—If your death occurs outside the State of Alabama or more than 35 miles from an authorized funeral director, we will pay a cash benefit of $150 ($75 if your death occurs before your first birthday) in lieu of the funeral benefit.

In such case payment may be made to the beneficiary, or to your executor or administrator, or to any relative of yours by blood or legal adoption or connection by marriage, or to any person appearing to us to be equitably entitled to payment by reason of having incurred expense for your maintenance, medical attention, or burial.

**PREMIUMS**—The consideration for this policy is the payment of the premiums when they are due, and no insurance will become effective until the first premium has been paid. The amount of the weekly premium is shown in the schedule on Page 4. This premium is due each Monday beginning with the date of issue and continuing for a period of twelve years. Premiums must be paid to one of our agents or to the cashier at one of our offices. If our agent does not call for any premium when it is due, payment of the premium is not excused, and in such case it is your responsibility to see that payment is made at one of our offices.

**GRACE PERIOD**—If any premium is not paid within 4 weeks of the date when it is due, this policy will lapse and cease to be in force except as provided under "Extended Insurance".

### FUNERAL POLICY

Weekly Premiums Payable for 12 Years

Benefit for Accidental Death

330—7-47—4300

ACCIDENTAL DEATH BENEFIT—Upon receipt at our Home Office of due proof that your death, prior to your 65th birthday, resulted from bodily injuries effected solely through external and accidental means and independently of all other causes and within 90 days from the date of such injuries while this policy was in full force and effect, we will, subject to the exclusions below, pay to your beneficiary an additional death benefit of $100 (or an additional death benefit of $50 in the event your accidental death occurs prior to your first birthday).

Exceptions—No benefit for accidental death will be payable: (1) if death occurs while this policy is being continued in force as extended insurance; (2) if the injury or death is caused or contributed to by (a) self-destruction, whether sane or insane, (b) any disease, illness, or infirmity, (c) medical or surgical treatment, (d) participation in an assault or felony, (e) operating or riding in or descending from any kind of aircraft of which you were the pilot, officer, or member of the crew, or in which you were giving or receiving training or instruction or had any duties, or (f) war or act of war (including insurrection, undeclared war, and armed aggression or its resistance), whether or not you are in military service of any country or international organization.

LOSS OF EYESIGHT OR LIMBS—Upon receipt at our Home Office of due proof of the loss of your eyesight or the loss of two or more of your limbs, prior to your 65th birthday, we will endorse this policy to waive all future premiums as they become due. Loss of eyesight means the total and permanent loss of sight of both eyes. Loss of a limb means the loss of a hand or foot by severance. The insurance against loss of eyesight or limbs is subject to the following conditions and exceptions:

Conditions—(a) The loss must be caused solely by disease contracted or injuries sustained after the date of issue, and (b) due proof of the loss must be presented to us within two years from the date of the loss.

Exceptions—No insurance is provided against any loss of eyesight or limb which occurs while this policy is being continued in force as extended insurance or which results from (a) intentionally inflicted injury, whether sane or insane, or (b) war or act of war (including insurrection, undeclared war, and armed aggression or its resistance), whether or not you are in military service of any country or international organization.

RESERVE BASIS—The basis of reserves for this policy is the Commissioners 1961 Standard Industrial Mortality Table, Commissioners Reserve Valuation Method, with interest at 3½% per year. The amount on which the reserve is maintained and computed under this policy is 50% of the retail value stated in this policy or the average wholesale cost to the Company of the funeral supplies, benefits and services furnished if the same is greater than 50% of such retail value.

NONFORFEITURE BENEFITS—The two following paragraphs provide for extended insurance and cash values after premiums have been paid for the periods shown. These benefits are computed by the Standard Nonforfeiture Value Method using the Commissioners 1961 Standard Industrial Mortality Table with interest at 3½% per year, except that extended term benefits are calculated on the Commissioners 1961 Industrial Extended Term Table with interest at 3½% per year. The benefits shown are those available after premiums have been paid for the exact periods shown. If there is no indebtedness against this policy. The actual calculation of any benefit will take into account the payment of premiums for a portion of a year beyond the exact number of years shown. Benefits for years after those shown will be furnished upon request.

EXTENDED INSURANCE—If this policy should lapse after premiums have been paid for the period of time shown, and has not been surrendered for its Cash Value, the insurance on your life will be continued without further premium payments for the number of years and months shown in the table below. The extended insurance will begin on the date the first unpaid premium was due.

TERMS OF EXTENDED INSURANCE FOR EACH AGE AT ISSUE

[Table of extended insurance values — data illegible]

CASH VALUE—After premiums have been paid for three years this policy will have a cash value. You may receive this value by making written application for it and surrendering this policy to us for cancellation. If this is done while no premium is more than 13 weeks past due, the cash value will be the amount shown in the table below. Otherwise it will be the net single premium for the remaining unexpired extended insurance. We reserve the right to defer payment of the cash value for a period of six months.

### CASH VALUES FOR EACH AGE AT ISSUE

| Age Last Birthday at Date of Issue | PREMIUMS PAID FOR | | | | | | | | | | Age Last Birthday at Date of Issue |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 3 YEARS | 4 YEARS | 5 YEARS | 6 YEARS | 7 YEARS | 8 YEARS | 9 YEARS | 10 YEARS | 11 YEARS | 12 YEARS | |

*(Numeric table data illegible due to scan quality.)*

BENEFICIARY—The beneficiary of this policy is named in the schedule on Page 4. The beneficiary may be changed at any time by giving us written notice of the desired change and evidence satisfactory to us that the proposed beneficiary has an insurable interest in your life. No change will be effective until we have endorsed it on this policy.

REINSTATEMENT—If this policy should lapse, you may reinstate it at any time within three years provided you have not surrendered it for its cash value. In order to do this you must pay all past due premiums and furnish evidence satisfactory to us that you are insurable. If this policy should be reinstated after having lapsed, no benefit will be payable for any loss which occurred while the policy was not in force.

WAR OR NATIONAL EMERGENCY—If during time of war or other national emergency, the United States Government restricts or allocates the use of steel or if it consequently becomes impracticable for the Company to furnish the metal casket provided by combining this policy with another policy providing for a funeral of the retail value of $250 or $300, the Company will furnish, in lieu thereof, such other casket of comparable retail value as the beneficiary or other person having proper authority, may select from the stock of an authorized funeral director of the Company.

ASSIGNMENT—You may not assign this policy or any of its benefits.

POLICY CONTROL—If you are over 18 years of age, you have the entire ownership and control of this policy. If you are under 18 years of age, the entire ownership and control of this policy shall be vested in the beneficiary named herein from time to time until you reach your 18th birthday. If the beneficiary having ownership and control of this policy should die before you, then the ownership and control of the policy, if you are under 18 years of age, shall be vested in your surviving parent or your legal guardian or in any adult person having custody and control of you as may be reasonably determined by us. Ownership and control of this policy includes the right to change the beneficiary and to exercise all other privileges provided in this policy.

MEANING OF PRONOUNS—Unless clearly contrary to the context, wherever used in this policy, the words "We," "Our" or "Company" shall mean Service Insurance Company of Alabama, Division of Liberty National Life Insurance Company; and "You" or "Your" shall mean the insured named in the schedule on Page 4.

ENTIRE CONTRACT—This policy is the entire contract between us. None of its provisions may be waived or changed except by written endorsement on this policy signed by the President, a Vice-President, an Assistant Vice-President, the Secretary, or an Assistant Secretary of the Company.

Signed at Birmingham, Alabama, by the President and Secretary of Service Insurance Company of Alabama, Division of Liberty National Life Insurance Company, as of the date of issue shown in the schedule on Page 4.

SECRETARY

PRESIDENT

230—7•67—8800

—3—

K

· DEC 08 '99  11:09AM WAT     FEES JIMMERSON                        P.19/19



# LIBERTY NATIONAL
## LIFE INSURANCE COMPANY
Birmingham, Alabama

## ACCIDENT POLICY

BENEFIT FOR DEATH BY ACCIDENTAL MEANS

BENEFIT FOR DEATH BY AUTOMOBILE ACCIDENT

BENEFIT FOR DEATH BY TRAVEL ACCIDENT

PREMIUMS PAYABLE UNTIL POLICY ANNIVERSARY IMMEDIATELY PRECEDING INSURED'S 70TH BIRTHDAY

THIS POLICY IS NONCANCELLABLE AND GUARANTEED RENEWABLE UNTIL THE POLICY ANNIVERSARY IMMEDIATELY PRECEDING INSURED'S 70TH BIRTHDAY

NONPARTICIPATING INDUSTRIAL POLICY



IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

ELLEN GAYLE MOORE, FANNIE )
McCONNELL, SPENCER WILLIAMS, )
and ANITA BOWERS, on Behalf of )
themselves and all Others Similarly )
Situated, )
                         )
         Plaintiff, )      Civ.No.:
                         )
vs. )      CLASS ACTION
                         )
LIBERTY NATIONAL INSURANCE )
COMPANY, )
                         )
         Defendant. )

## REQUEST FOR SERVICE BY
## CERTIFIED MAIL

Please serve the defendants Liberty National Insurance Company, by certified mail pursuant to Alabama Rules of Civil Procedure 4.1 and Federal Rules of Civil Procedure 4(c)(2)(C)(i).

Joe Whatley, Esq.
Charlene P. Cullen, Esq.
Whatley Drake, L.L.C.
1100 Financial Center
505 20th Street North
Birmingham, AL 35203
Office: (205) 328-9576
Fax: (205) 328-9669

Herman Watson, Esq.
Rebekah Keith, Esq.
Watson Jimmerson, P.C.
200 Clinton Avenue West, Suite 800
Post Office Box 46
Huntsville, AL 35804
Office: (256) 536-7423
Fax: (256) 536-2689

Melvyn I. Weiss, Esq.
Milberg, Weiss, Bershad, Hynes
    & Lerach, L.L.P.
One Pennsylvania Plaza
New York, NY 10119-0165
Office: (212) 594-5300
Fax: (212) 868-1229

John J. Stoia, Jr., Esq.
Milberg, Weiss, Bershad, Hynes
    & Lerach, L.L.P.
600 West Broadway
Suite 1800
San Diego, California 92101-5050
Office: (619) 231-1058
Fax: (619) 231-7423

W. Christian Hoyer, Esq.
Christa L. Collins, Esq.
James Hoyer Newcomer Forizs
    & Smiljanich, P.A.
One Urban Center, Suite 147
4830 West Kennedy Boulevard
Tampa, FL 33609
Office: (813) 286-4100
Fax: (813) 286-4174

Andrew S. Friedman, Esq.
Bonnett, Fairbourn, Friedman
    & Balint, P.C.
4041 North Central Avenue
Suite 1100
Phoenix, AZ 85012-3311
Office: (602) 274-1100
Fax: (602) 274-1199

2

Ron Parry, Esq.
Arnzen, Parrry & Wentz, P.S.C.
128 East Second Street
Post Office Box 472
Covington, KY 41012-0472
Office: (606) 431-6100
Fax: (606) 431-2211