ECEIVED 2 Aug 04
Bradley Arant Rose & White LLP
M. Pennington

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| IN RE: LIBERTY NATIONAL INSURANCE CASES | ) ) ) ) | **Master Case Number:**<br><br>CV-02-C-2741-2 |

*************************

| | | |
|---|---|---|
| **ELLEN GAYLE MOORE, FANNIE W. McCONNELL** (on behalf of herself and as beneficiary for the Liberty National Life Insurance Policies owned by Spencer Williams, who is now deceased), **MARSHALL ORR; MARSHALL ORR, JR.; LINDA HILL CHAPMAN; DANNY HILL**; and **CLEODELL HILL**, on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) | |
| v. | ) ) | CV-99-3262-S |
| **LIBERTY NATIONAL LIFE INSURANCE COMPANY,** | ) ) ) | |
| Defendant. | ) ) | |

## THIRD AMENDED CLASS ACTION COMPLAINT

Plaintiffs bring this action both individually and on behalf of the class of persons defined below against Liberty National Life Insurance Company , and pursuant to their investigation, upon knowledge as to themselves and their own acts and otherwise upon information and belief, for their Complaint allege as follows:

1

## I.  JURISDICTIONAL ALLEGATIONS

Plaintiffs Ellen Gayle Moore, Fannie McConnell (on behalf of herself and as beneficiary for the Liberty National policies owned by Spencer Williams, who died during the pendency of this action, on July 26, 2001), Marshall Orr, Marshall Orr, Jr., Linda Hill, Danny Hill and Cleodell Hill are citizens of DeKalb County, State of Alabama.

1.      Defendant Liberty National Life Insurance Company  is an Alabama corporation which conducts substantial business in many states.  Liberty National Life Insurance Company and several life insurance companies owned by Liberty National Life Insurance Company  sold a substantial number of industrial insurance products, including, but not exclusive of, life insurance, burial insurance, and health and accident insurance.  Service Insurance Company of Alabama ("Service"), was a  wholly owned subsidiary of Liberty National Life Insurance Company , which has been merged into Liberty National Life Insurance Company .  Liberty National  Life Insurance Company  is responsible for and has assumed the liabilities of Service.  Prior to the merger referred to above, Service was operated by and controlled by Liberty National Life Insurance Company  for the purpose of issuing insurance products to African-Americans.  At all times Liberty National Life Insurance Company  has controlled Service in all respects including, but not limited to, the establishment of premium rates and  Policy administration and issuance policies and procedures. Liberty National Life Insurance Company  and Service are hereinafter collectively referred to as "Liberty National" in this Complaint.

2.      A substantial number of the events, omissions and conduct which gave rise to the Plaintiffs' claims took place in DeKalb County, Alabama.

2

3.      Because Liberty National resides and conducts business in this district and because a substantial part of the events, omissions and conduct giving rise to the claim occurred in this district, venue is proper in this district and this division. Federal jurisdiction exists pursuant to 28 U.S.C. §1331 as to Plaintiffs' claims of race discrimination in violation of 42 U.S.C. §§1981 and 1982. The Court has supplemental jurisdiction of all remaining claims pursuant to §1367.

## II.   NATURE OF THE CASE

.       This is a class action seeking redress for a nationwide scheme and common course of conduct involving racial discrimination, fraudulent concealment, unconscionable conduct and breach of contract by Liberty National relating to the marketing, sale and administration of so-called "industrial life" insurance policies.  As used in this Complaint, the terms "Policies," "Industrial Policies," "Industrial  Insurance" and "Industrial Life Insurance" refer to and shall mean any life insurance policy underwritten and/or issued by Liberty National that is marked, stamped or otherwise referred to (either expressly or commonly) as "industrial," "debit," "burial," "funeral" or "home service" insurance or otherwise expressly categorized as "industrial," "debit," "burial," "funeral" or "home service" insurance by statute in those states where Liberty National  markets policies and includes all life insurance policies and health and accident policies which include an accidental death benefit, with a face amount of $25,000 or less. These terms also include all ordinary and Monthly Debit Ordinary policies with a face amount of $10,000 or less. The definition is not limited to the statutory definition of industrial life insurance.  It includes but is not limited to insurance policies where premiums are or were collected on a home service or debit method.

5.      This action is brought by Plaintiffs as a class action on behalf of all African-American persons who have (or had at the time of the Policy's termination) an ownership interest (or

beneficiary interest if a death benefit was paid or payable on the Policy) in one or more Industrial Policies issued by Liberty National, and whose Policies were issued and administered based upon the nationwide unconscionable scheme and common course of conduct described herein and who were thereby harmed (the "Class" or "Class Members").

6.    Plaintiffs seek injunctive and equitable relief, punitive damages and other remedies for Liberty National's unlawful, unconscionable and racially discriminatory conduct described herein in connection with the training of its agents and the sale and administration of Industrial Life Insurance Policies to Plaintiffs and Class Members.

7.    For more than fifty years, Liberty National has maintained a discriminatory and unconscionable scheme in order to increase its own revenues and profitability to the detriment of Class Members, by implementing uniformly misleading, deceptive, unconscionable, and racially discriminatory sales and Policy administration practices. Liberty National instituted these practices, *inter alia*, in order to compete with other insurance companies offering similar types of Policies.

8.    Industrial Life Insurance is a life insurance product with relatively low face value which is typically, although not always, less than $2,000, and premium payments which are intentionally designed to appear to the policyholder to be modest premium payments. These premium payments have been historically collected on a weekly or monthly basis by Liberty National sales agents.

9.    As part of its nationwide scheme, Liberty National targeted low income, impoverished, unsophisticated and minority segments of the population and marketed the Industrial Policies for sale to these consumers. In addition, on information and belief, for many years, Liberty National routinely, knowingly and intentionally caused Service to charge African-American

4

individuals more for these Policies than Liberty National charged similarly situated Caucasian individuals. On information and belief, to the extent this discriminatory practice changed, African-Americans who purchased Industrial Policies before this discriminatory practice changed, continued to pay the same premiums which had been established under Liberty National's discriminatory pricing system. Liberty National also, as part of its routine practice and procedures, prohibited its agents from selling ordinary life insurance policies to African-Americans. Liberty National was motivated by discriminatory intent and continues to discriminate against African-Americans in the manner set forth below.

10.     Liberty National constructed the Industrial Policies with small face value and charged weekly or monthly premiums often under $1.00. Liberty National has intentionally marketed these Policies through agents who are given exclusive territories, known as "debit routes." To effectuate the sale and administration of the Industrial Policies on a "debit" basis, Liberty National agents have been trained to personally visit the homes of Class Members residing on their routes to collect the premiums and develop a personal relationship with the Class Members that would facilitate the sale of additional Policies. Liberty National has trained its agents to market and sell certain of these Policies as "burial" protection to manipulate the emotions of prospective policyholders by instilling in, or playing to, a sense of shame in leaving their loved ones without funds to pay for a funeral at the time of their death.

11.     In designing, developing, marketing and selling these Policies, at all times Liberty National has known that it targeted a disadvantaged segment of the population which was unsophisticated with respect to insurance and related financial dealings or affairs and ill-equipped to understand the unfamiliar and technical language of the Policies, or the complex and sophisticated

5

methods of determining premium payments. Liberty National has also known that the premiums appear small and affordable to Class Members, and that at the time of purchase the benefits totaled more than these disadvantaged individuals could conceive of saving in their lifetime. Liberty National has known, but has intentionally concealed from Class Members, what these targeted, unsophisticated Class Members did *not* know; that with respect to certain Policies, the small premiums would far exceed the face value of the Policies during the insureds' lifetime.

12.    Liberty National designed the Industrial Policies to create the illusion that they would provide valuable yet affordable benefits. In reality, the Policies are unconscionable products which were calculated to generate tremendous profits for Liberty National with little attendant risk to Liberty National and little or no economic benefit for the unsuspecting and vulnerable Plaintiffs and Class Members. At the same time, although the premiums appeared small and affordable, the premiums are exorbitant in relation to the minimal benefits actually provided to Class Members. Further, Liberty National has known that, in the event of lapse for nonpayment of premium, Liberty National's practice is to conceal any cash value from its policyholders and to use any cash value to pay premiums until any and all Policy value is completely depleted.

13.    Given the design features of the Industrial Policies, Liberty National has known that virtually no transfer of risk to Liberty National has taken place. Liberty National also has known that to the extent that any risk was transferred, it was *de minimis* and would quickly dissipate over the life of the Policies. As Liberty National expected, the Company's profits have continued to expand and the *de minimis* risk, if any, has been quickly eliminated.

14.    Liberty National has trained, allowed or encouraged its agents to routinely sell Industrial Life Insurance products to Plaintiffs and Class Members when the Class Members' best

6

interest would have been served, assuming a life insurance need existed, by traditional ordinary life insurance of similar face amounts.

15.    Liberty National has trained, directed and knowingly allowed its agents to sell multiple Policies where policyholders had no need for the insurance and where multiple Industrial Policies were used to reach a cumulative total of face amount which, in the best interest of the Plaintiffs and Class Members, could have been achieved through the use of ordinary policies of comparable value.  Liberty National has had knowledge when multiple sales occurred through its established home office issuance procedures.  Nevertheless, Liberty National has maintained this practice because of the excessive profitability of the Industrial Life Insurance products.

16.    Consistent with its effort to increase profits, Liberty National has knowingly and intentionally set out to cut the administration costs associated with Industrial Policies even when doing so worked to the detriment of its African-American policyholders.  Liberty National issued Industrial Policies which had, for many years, been serviced by agents on weekly debit routes.  In furtherance of its plan to increase its profits and decrease its costs at the expense of African-American policyholders, Liberty National has terminated or modified the practice of weekly premium collection by debit agents throughout the country on in-force Industrial Life Policies.  Liberty National has not reduced premium payments even though the costs associated with the weekly debit system were expense loaded into the premium at the time of Policy issuance and therefore has been unjustly enriched by this practice.  This practice of weekly premium collection by agents was part of the course of dealing between the African-American policyholders and Liberty National.

17.    Liberty National Insurance Company has also systematically failed to pay death

7

benefits that were due to Class members who were beneficiaries under the Industrial Policies. Liberty National has improperly reaped millions of dollars in premiums and unpaid death benefits by virtue of its fraudulent concealment and overreaching policy administration practices.

18.     Liberty National Insurance Company's plan, scheme and nationwide common course of conduct was designed to and did induce thousands of existing and prospective African-American policyholders to purchase Industrial Policies from Liberty National.  Plaintiffs and Class Members have lost and/or face losing millions of dollars in premiums paid which exceed the face value of the Policies or which exceed a reasonable or appropriate total of premiums which should have been paid for their Policies, and are receiving reduced death benefits.

19.     The sales practices described herein have been successful for Liberty National. Liberty National has received millions of dollars of premium income on the Policies including millions of dollars of premiums which cumulatively exceed the reasonable or appropriate total of premiums which should have been paid for the Industrial Policies.

20.     Insurance premiums constitute the consideration paid to an insurer for the issuance and delivery of a policy of insurance.  Insurance premiums are determined by multiplication of the rate (or unit charge) to the measure of exposure or amount of insurance provided in an insurance policy.

21.     Rate-making is the process of establishing rates used in insurance to estimate the future costs associated with the transfer of risk.  Insurance rates are established by actuaries employed by insurance companies, including Liberty National.  Actuaries hold themselves out, and are held out by their employers, to be professionals charged with the duty to act in the public interest. The American Academy of Actuaries has adopted Actuarial Standards of Practice as well as a Code

8

of Professional Conduct. The Preface to the Actuarial Standards of Practice provides that Actuaries are expected to provide counsel which is not only in the clients' interest but also in the interest of the public. Actuaries are to act in the public interest with "competence, integrity and objectivity of a high order."

22.     The premiums established and charged to the Plaintiffs and the Class by Liberty National for Industrial Insurance Policies are and were known by Liberty National to be racially discriminatory, excessive, unfair, unconscionable, unlawful and unreasonable. Liberty National's Industrial Insurance Policies were designed to and have yielded a rate of return on these insurance products for Liberty National which is unreasonable.

## III.   ACCRUAL, FRAUDULENT CONCEALMENT, CONTINUING VIOLATION AND EQUITABLE TOLLING

23.     Plaintiffs' claims did not accrue and the statute of limitations did not begin to run until the Plaintiffs knew or reasonably should have known that they were suffering injuries based upon unlawful discrimination. Plaintiffs and Class Members did not know and did not have reason to know that they were injured or that they were being discriminated against until less than two years prior to the filing of the original complaint in this action. In addition, Plaintiffs' claims have accrued within the limitations period because Liberty National's violations are continuing.

24.     Furthermore, the statute of limitations has not run as to Plaintiffs' claims because the statute of limitations would be suspended due to Liberty National's fraudulent concealment of its discriminatory practices. The statute of limitations would also be tolled under the doctrine of equitable tolling.

25.     When Plaintiffs purchased their Policies, they were told that purchasing a given

Policy would cost a specified amount. Plaintiffs were not shown rate books. Plaintiffs were not shown anything that would indicate the premiums paid by Caucasian policyholders. Plaintiffs were not told Caucasian policyholders paid lower premiums. Liberty National did not tell Plaintiffs that different rates existed for Caucasian policyholders. Plaintiffs were not shown any documents which would reveal that Caucasian policyholders paid lesser premiums for the same coverage. The logical inference from everything Liberty National told Plaintiffs was that all policyholders paid the same premiums for the same types of policies.

26.     Plaintiffs and Class Members were given no information that would have alerted them to Liberty National's discriminatory conduct with respect to premiums, cash values and death benefits, either at the point of sale or in later years. Plaintiffs and Class Members received no documents reflecting Liberty National's discriminatory premiums or other discriminatory practices. The Policies themselves do not reflect that African-Americans were charged higher premiums or that they would receive lower death benefits and cash values than similarly situated Caucasians, nor did they receive annual statements or any other documents which reflected Liberty National's ongoing and knowing discrimination. In fact, although Liberty National's sales agents used rate books reflecting Liberty National's discriminatory practices, the agents were trained to withhold this information from prospective African-American policyholders. Thus, the Liberty National rate books were neither disseminated nor made available to Plaintiffs and Class Members.

27.     The decisions to sell to African-Americans, to discriminate on the basis of race and to conceal Liberty National's discriminatory practices were made in the 1930's or early 1940's. Liberty National continues to act in accordance with and in furtherance of its discriminatory practices as set forth more fully herein. Liberty National also continues its practice of fraudulently concealing

10

its discriminatory practices. Throughout this time period, Liberty National has refused to release or provide information about its knowing discrimination against Plaintiffs and Class Members in any way that the Plaintiffs and/or Class Members could have discovered the discrimination. In fact, Liberty National has taken a number of actions to fraudulently conceal its discriminatory practices to insure that these practices were not discovered. This fraudulent concealment permits the Plaintiffs to bring federal claims on behalf of persons who were harmed by defendant more than two years prior to the filing of this lawsuit. Although the initial decisions to discriminate and to conceal were made in the 1930's, or early 1940's, Liberty National has repeatedly made the decision throughout the time period to continue the concealment of its discriminatory practices and has acted in accordance with this decision.

28.    Liberty National ensured that Plaintiffs could not and would not, through the exercise of due diligence, discover Liberty National's unlawful discriminatory conduct due to the undisclosed and indecipherable manner in which the Policies were designed and priced by Liberty National.

29.    Beginning in or about 1941, the insurance industry constructed mortality tables which used race as a factor to discriminate against African-Americans, who had been disadvantaged by discriminatory socio-economic conditions.

30.    The insurance industry employed these mortality tables as a pretext to charge higher premiums and to pay comparatively lower cash values and death benefits to African-Americans, as compared to Caucasian policyholders.

31.    These mortality tables were not disseminated or otherwise made available to African-Americans who were disadvantaged by the tables.

32.    The discriminatory mortality assumptions, in turn, were deliberately embedded in the

11

pricing and policy design assumptions by Liberty National and other insurance companies. Nowhere on the face of Policy documents provided to African-American policyholders does *any* information appear which would reveal that the premium charged was based upon racially discriminatory rates.

33.    The unknown and inherently unknowable nature of Liberty National's discriminatory pricing and Policy benefit determinations was exacerbated by the premium rate structure adopted by Liberty National.    The premium rate quoted and charged to any particular policyholder was dependant on a number of undisclosed rating factors, including, for example, attained age, policy type and the face amount of coverage.

34.    Thus, as a practical reality, it was impossible for African-Americans who purchased a Policy from Liberty National to compare their effective premium rate with the premiums charged to similarly situated Caucasian policyholders.    Consequently, even if Plaintiffs or other Class Members had reason to inquire or investigate, they would not and could not have discovered that they were sustaining injuries from unlawful, discriminatory conduct by Liberty National. Moreover, as Liberty National is aware African-American policyholders would not, and did not, learn the rates being charged to Caucasian policyholders were lower for the same amount of insurance.

35.    The same is true with respect to cash values and death benefits.    The inherently undiscoverable nature of Liberty National's discriminatory conduct was further hidden from Plaintiffs and the Class by Liberty National's affirmative efforts to conceal its unlawful conduct through pretextual and misleading premium rates and its other acts of fraudulent concealment, as alleged below.

36.    Liberty National, its affiliates and the companies for which Liberty National is now responsible engaged in a concerted and continuous course of conduct that was intended to

12

fraudulently conceal their unlawful discriminatory practices from Plaintiffs and the Class.

37.    Internally, Liberty National acknowledged its discriminatory policies, classifying African-American policyholders charged higher premiums as "Negro" risks as opposed to Caucasian policyholders, who were termed "white" risks. In its dealings with African-Americans, however, Liberty National concocted an elaborate and pretextual premium rating structure to disguise and conceal from Plaintiffs and the Class the fact that they were being charged racially discriminatory premiums.

.    In the rate books disseminated by Liberty National to its field sales force, the rates for African-Americans were pretextually referred to as "standard" rates, while the rates for Caucasians were referred to as "preferred" rates.

39.    Liberty National trained its agents to sell Policies to African-Americans using the more expensive, discriminatory premiums and trained its agents not to disclose to African-American policyholders that the premiums were discriminatory. Liberty National's sales force was trained to tell potential African-American customers, and in fact did tell them on a systematic basis, that they were receiving the "standard" rates. The logical inference was that the African-Americans were not being discriminated against. In fact, African-Americans were actually being charged a higher, discriminatory rate.

40.    By design, African-Americans were misled so as to believe that they were paying the same "standard" non-discriminatory rates as Caucasian policyholders. The sales force did not tell African-American customers that the "preferred" rate was for white customers only.

41.    This practice began in the 1930's, or early 1940's and continued at least until the mid-1970's. Liberty National either knew or reasonably should have known that Plaintiffs and Class

13

Members would not learn about the discrimination. The nature of society was and is such that African-Americans generally would not learn the more favorable rates that were being charged to Caucasians. Liberty National refused to release or provide information about its discrimination against Plaintiffs and the Class in any way that the Plaintiffs and/or Class Members could have discovered the discrimination.

42.    To maximize its discriminatory sales to African-Americans, Liberty National adopted a distribution system which created economic incentives for its sales agents to prey on the African-American community.

43.    Liberty National sales agents were assigned "debit" routes confined to predominantly African-American communities and neighborhoods.

44.    Likewise, Liberty National agents were authorized or encouraged to sell higher priced, poorly performing Industrial Policies to African-Americans and were prevented or discouraged from selling to African-Americans other available products that would provide better benefits for lower premiums.

45.    Liberty National adopted a compensation system which rewarded sales agents economically for discriminatory sales to African-Americans. Liberty National agents were paid commissions based on the premium amount of insurance that they sold. Thus, Liberty National agents profited to the extent they sold higher-priced inferior policies to African-Americans. In the compensation plan for agents who sold its policies, Liberty National created incentives for the agents to disclose only those facts that would encourage sales of insurance. Liberty National itself, like its agents, also benefitted from increased sales to African-Americans of higher-priced inferior insurance policies. Disclosure of the fact that Plaintiffs and the Class had been the victims of discrimination

would have reduced sales or required Liberty National to lower premiums or provide increased benefits to African-Americans, thereby reducing Liberty National's profits.

46.    Therefore, as a result of the sales system and incentives that Liberty National created, the unlawful, racially discriminatory practices outlined herein were intentionally concealed from Plaintiffs and the Class.

47.    Beginning at least in the 1930's, or early 1940's and continuing today or until very recently, Liberty National employed underwriting or rating classifications as a clandestine means to discriminate against African-Americans. Liberty National developed underwriting criteria which appeared to be racially neutral but which were, in reality, employed as a pretext to continue discrimination against African-Americans. For example, Liberty National specified certain occupations (such as janitors, maids and "bootblacks") that were predominantly held by African-Americans and used other underwriting criteria (such as undesirable residential neighborhoods, immoral behavior, or undesirable personal traits) to justify Liberty National's continued practice of charging African-Americans higher premiums for inferior policies. These pretextual standards created the appearance of racially neutral underwriting when, in fact, they were used as tools to continue and conceal Liberty National's discriminatory conduct. Similarly, Liberty National replaced its older Industrial Policies with new products, such as so-called "monthly debit ordinary" or "MDO" policies to continue and to conceal Liberty National's ongoing unlawful discrimination.

48.    Plaintiffs and Class Members could not reasonably discover the discriminatory premiums and did not do so until less than two years before the filing of the lawsuit. Statements or actions undertaken by Liberty National to obscure the claims of the Plaintiffs and the Class included training Liberty National's sales agents, directly or indirectly, not to tell Plaintiffs and the Class about

15

Liberty National's discriminatory practices and conduct.

49.     Plaintiffs and the Class were misled into believing that they were being charged standard, nondiscriminatory rates, and none of the Plaintiffs or Class Members learned about the discrimination until less than two years before the filing of this lawsuit. In fact, they did not learn about the discrimination until a very short time before the lawsuit was filed. For the reasons alleged above, the vast majority of Class Members still do not know that they have been and continue to be injured by Liberty National's discriminatory conduct. Therefore, the limitations period has not possibly run on the Plaintiffs and Class Members. Much of the information about all of the matters pleaded in this section is in the sole possession of Liberty National. Based upon information and belief, the Plaintiffs allege that discovery will lead to more detailed and particular information relating to the matters alleged herein and to Liberty National's practices of fraudulent concealment.

50.     As a practical matter, no Plaintiff or Class Member could have discovered Liberty National's discriminatory conduct. Since Liberty National began selling to African-Americans, the Company instructed its agents not to inform African-American policyholders of the discriminatory rates. Liberty National and its agents knew that disclosing such information would result in the sale of fewer policies to African-Americans. Since Liberty National initially began selling to African-Americans and continuing until the mid-1970's, Liberty National instructed its agents that they were not allowed to sell better policies to African-American customers. One of the ways that Liberty National concealed the discrimination from Plaintiffs and the Class was that Liberty National effectively trained its agents not to share or show full rate books to customers. At most, the agents would show only the rate that was being charged to the person buying the policy, and the rate book said that it was a standard rate, leading Plaintiffs and Class Members to believe that they were not

16

being discriminated against. The Plaintiffs allege that this practice continues today. Liberty National further concealed its discriminatory practices by changing the name of its product from Industrial Life to monthly debit ordinary life insurance. In reality, no consumer could or can discover Liberty National's racial discrimination, given the way premiums are set. Absent disclosure by Liberty National or its agents, Plaintiffs and Class Members could not discover that they were being discriminated against. Liberty National did not make such disclosures. Instead, Liberty National actively concealed its discriminatory conduct.

51.    In addition, the limitations period has not run because Liberty National's discriminatory conduct is continuing in nature. Liberty National continues to charge and accept discriminatory premiums from various Plaintiffs and Class Members. For example, Plaintiff McConnell is still paying premiums on Policy #15153077. She is paying twelve cents per week because she is African-American, and if she were Caucasian, she would be paying ten cents per week for this $2,000 policy. Deceased plaintiff Williams was paying premiums of 35 cents per week because he was African-American, and if he had been Caucasian, he would have paid 30 cents per week. His beneficiary, plaintiff McConnell, should receive a higher death benefit in the amount of insurance equal to what a Caucasian would have received for the same premium. Plaintiff Bowers is still paying premiums at a higher rate because she is African American.

52.    Even with respect to "paid up" policies, there are "cash values" which Liberty National adjusts each year. Liberty National continues to discriminate against each Plaintiff and Class Member when it adjusts the cash values of the Policies, including within two years of the filing of the complaint. In fact, the difference in cash values for Policies sold to African- Americans as compared to Policies sold to Caucasians continues to increase each year.

17

53.     There is a substantial nexus between the acts of discrimination within the two years of filing suit and the acts of discrimination prior to that time. The acts involve the same type of discrimination. The acts are recurring and not isolated.

54.     However, the acts of discrimination did not trigger the awareness of the Plaintiffs or the Class Members to assert their rights, because, among other things, there was no reasonable way for the Plaintiffs or the Class Members to learn that they were being discriminated against, and they did not learn of the discrimination.

55.     Finally, Liberty National is equitably estopped from raising the statute of limitations. The equitable tolling is justified based upon the matters alleged throughout this complaint including the matters set forth above in this section.

56.     Plaintiffs and Class Members have acted with reasonably prudent regard with respect to their rights. The facts which support the Plaintiffs' causes of action were not apparent to the Plaintiffs or the Class Members. The practicalities of the situation justify any delay in the filing of the claims in this action.

## IV.  FACTUAL ALLEGATIONS

57.     Plaintiffs are residents of Collinsville, DeKalb County, Alabama. Ms. Moore is a 51 year old African-American who was charged a discriminatory premium on her life insurance Policy. Ms. McConnell is a 74 year old African-American who was charged a discriminatory premium on her insurance Policies.  Mr. Williams is a deceased African-American who was charged a discriminatory premium on his insurance Policies. Ms. Bowers is a 45 year old African-American who was charged a discriminatory premium on her insurance Policies. Mr. Marshall Orr is a 65 year old African-American who was charged a discriminatory premium on his insurance policies and a

18

discriminatory premium on a policy (10 Pay Life) that he purchased on the life of his son Marshall Orr, Jr. Mr. Marshall Orr, Jr., is a 42 year old African-American who was insured on a 10 Pay Life policy with Liberty National when he was 1 year old the premiums on which were discriminatory and paid by his father. He is presently the owner of said policy by operation of policy provisions upon reaching majority and his father is the named beneficiary. Mrs. Cleodell Hill is a 79 year old African-American who was charged a discriminatory premium on her insurance policies. Mr. Danny L. Hill is 46 year old African-American who is the present owner of a paid up insurance policy upon which discriminatory premiums were charged during his minority. Linda Hill Chapman is a 48 year old African-American who is the owner of a paid up 10 Pay Life insurance policy that was paid up during her minority upon which discriminatory premiums were charged.

***Ellen Gayle Moore***

58.    Ms. Moore is a member of the Class defined above.

59.    Ellen Gayle Moore is a resident of Collinsville, DeKalb County, Alabama. Ms. Moore is an African-American who was charged a premium that Liberty National knew to be racially discriminatory on her life insurance Policy, and was also discriminated against as a result of Liberty National's practices alleged above.

60.    On November 15, 1954, Ms. Moore became the insured on an Industrial Life Insurance Policy #929921 which was issued by Service.

61.    Ms. Moore paid her premiums based upon a racially discriminatory premium rate and as a result paid more for her Policy than similarly situated Caucasian individuals would pay.

***Fannie McConnell***

19

62.    Ms. McConnell is a member of the Class defined above.

63.    On April 5, 1965, Ms. McConnell became the insured on an Industrial Insurance Policy #2341927 issued by Service. On November 24, 1969, Ms. McConnell became the insured on an Industrial Insurance Policy #14758551, which was issued by Service. On June 25, 1970, Ms McConnell became the insured on an Industrial Insurance Policy #15153077, which was issued by Liberty National. On May 13, 1974, Ms. McConnell became the insured on an Industrial Insurance Policy #21460692, which was issued by Liberty National Life Insurance Company.

64.    Ms. McConnell paid and is paying her premiums based upon a premium rate that Liberty National knew to be racially discriminatory and as a result paid more for her Policy than similarly situated Caucasian individuals would pay. Ms. McConnell was also discriminated against as a result of Liberty National's discriminatory practices outlined above.

65.    The premiums on the policies were established based upon a weekly debit collection system. The costs associated with this system were loaded into the premiums at the time of issuance. Despite Liberty National's termination of the weekly debit collection system, Liberty National continued to collect the same premium amounts.

*Fannie McConnell (as Beneficiary Under the Policy Owned by Spencer Williams)*

66.    Fannie McConnell is a member of the Class defined above by virtue of being the beneficiary to death claims paid on Liberty National Policies formerly owned by deceased plaintiff Spencer Williams.

67.    On April 5, 1965, Mr. Williams became the insured on an Industrial Insurance Policy #2341929, which was issued by Service. On November 24, 1969, Mr. Williams became the insured on an Industrial Insurance Policy #14758553, which was issued by Service. On August 18, 1975,

20

Mr. Williams became the insured on an Industrial Insurance Policy #22289217, which was issued by Liberty National Life Insurance Company.

68.    Mr. Williams paid his premiums based upon a premium rate that Liberty National knew to be racially discriminatory and as a result paid more for his Policy than similarly situated Caucasian individuals would pay. He continued to pay such discriminatory premiums until his death in 2001. Because Mr. Williams paid inflated discriminatory premiums on his Policies, he should have received a higher death benefit than what was paid to the beneficiary, Fannie McConnell. Thus, Fannie McConnell has been harmed as a result of Liberty National's discriminatory conduct. In addition, Mr. Williams was discriminated against as a result of Liberty National's discriminatory practices alleged above.

***Anita Bowers***

69.    Ms. Bowers is a member of the Class defined above.

70.    On April 5, 1965, Ms. Bowers became the insured on an Industrial Insurance Policy #2341930, which was issued by Service Insurance Company of Alabama. On November 24, 1969, Ms. Bowers became the insured on an Industrial Insurance Policy #14758555, which was issued by Service. On August 11, 1975, Ms. Bowers became the insured on an Industrial Insurance Policy #22275736, which was issued by Liberty National.

71.    The premiums on the policies were established based upon a weekly debit collection system. The costs associated with this system were loaded into the premiums at the time of issuance. Despite Liberty National's termination of the weekly debit collection system, Liberty National continued to collect the same premium amounts.

72.    Ms. Bowers paid and continues to pay her premiums based upon a premium rate that

21

Liberty National knew to be racially discriminatory and as a result paid more for her Policy than similarly situated Caucasian individuals would pay. In addition, Ms. Bowers was discriminated against as a result of Liberty National's discriminatory practices alleged above.

73.    The premiums on the Policies were established based upon a weekly debit collection system. The costs associated with this system were loaded into the premiums at the time of issuance. Despite Liberty National's termination of the weekly debit collection system, Liberty National continued to collect the same premium amounts.

**Marshall Orr and Marshall Orr, Jr.**

74.    Marshall Orr, Jr. and Marshall Orr are members of the Class defined above.

75.    On May 20, 1963, Mr. Orr, Jr. became the insured on an Industrial Life Insurance Policy # 2112031which was issued by Service. Mr. Orr, the father of Mr. Orr, Jr., was the named beneficiary on said Policy and paid the premiums on same until it was paid up. Further, Mr. Orr, on July 16, 1962, became the insured on Industrial Life Insurance Policy # 1992260 which was issued by Service.

76.    Mr. Orr paid the premiums on the Policies so stated upon a racially discriminatory premium rate and as a result paid more for said Policies than similarly situated Caucasian individuals would pay.

**Linda Hill Chapman, Cleodell Hill and Danny L. Hill**

77.    Linda Hill Chapman, Cleodell Hill and Danny L. Hill are members of the Class defined above.

78.    On July 8, 1963, Linda Hill (Chapman) became the insured on an Industrial Life

22

Insurance Policy # 2127878. At that time she was age 7. This Policy was paid up on June 18, 1973, during Linda Hill Chapman's minority. Upon reaching majority Ms. Chapman became the owner of said Policy as well as the insured. All premiums on this Policy were paid by Cleodell Hill and her deceased husband Leonard Hill.

79.    On November 13, 1961, Cleodell Hill became the insured on Industrial Life Policy # 1896640, which was issued by Service.

80.    Ms. Hill paid her premiums based upon a racially discriminatory premium rate and as a result paid more for her Policies than a similarly situated Caucasian.

81.    On November 13, 1961, Danny L. Hill became the insured on an Industrial Life Insurance Policy # 1896648. At that time he was age 4. This Policy was paid up on October 25, 1976, during Danny L. Hill's minority. Upon reaching majority Mr. Hill became the owner of said Policy as well as the insured. All premiums on this Policy were paid by Cleodell Hill and her deceased husband Leonard Hill.

## V.  CLASS ACTION ALLEGATIONS

82.    This case is brought as a class action under Fed. R. Civ. P. Rule 23(a), (b)(2) and (b)(3). Plaintiffs seek certification of this action as a class action on behalf of all African-American persons who have (or had at the time of the Policy's termination), an ownership interest (or beneficiary interest if a death benefit was paid or payable on the Policy) in one or more Industrial Life Insurance Policies issued, serviced, administered or purchased from Liberty National, and who were harmed by the conduct alleged herein (the "Class"). Alternatively, Plaintiffs seek certification of this action as a class action on behalf of all black Americans who have (or had at the time of the Policy's termination), an ownership interest (or had at the time of the policy's termination), an

ownership interest in an industrial life insurance policy or burial policy[1] issued prior to January 1, 1966, at a higher rate than similar plans offered to similarly situated white Americans by Defendant Liberty National Insurance Company, or its subsidiary Service Insurance Company of Alabama. This case is properly brought as a class action under Rule 23, for the reasons set forth in the following paragraphs.

83.    Certification under Rule 23(b)(2) is appropriate because plaintiffs seek equitable relief, including injunctive relief, declaratory relief, restitution and punitive damages incidental to, or flowing from, such relief, for the entire Class. Certification under Rule 23(b)(3) is also appropriate.

84.    Membership in the Class is so numerous that separate joinder of each member is impracticable. The number of Class Members is unknown but can be easily determined from the records of Liberty National. Plaintiffs believe that there are thousands of persons in the Class. Although Plaintiffs do not presently know the names of all Class Members, their identities and addresses can be readily ascertained from Liberty National's records.

85.    The named Plaintiffs are members of the Class of victims described herein. They were subject to a common course of conduct by Liberty National and purchased Industrial Life

---

[1] The terms "industrial insurance policy" and "burial policy" are not limited to the statutory definition of industrial life insurance. Rather, these terms refer, without limitation, to:

a)    any life insurance policy stamped, marked, or otherwise referred to or categorized (either expressly or commonly) as "industrial," "debit," "burial," "funeral," or "home service" insurance;

b)    life, health, and accident insurance policies (which include an accidental death benefit) with a face value of less than $25,000;

c)    ordinary and monthly debit ordinary policies with a face amount of $10,000 or less; and

d)    insurance policies collected on a "home service," or a "debit" method of payment.

Insurance from Liberty National based upon the discriminatory sales and policy administration practices described herein.

86.     There are numerous and substantial questions of law and fact common to all Class Members which control this litigation and which predominate over any individual issues. Included within the common questions are:

1.      Whether Liberty National discriminated against Class Members by charging them more in premiums for Industrial Life Insurance than similarly situated Caucasian people;

2.      Whether Liberty National discriminated against Class Members by offering only substandard products to African-Americans;

3.      Whether Liberty National discriminated against Class Members by altering the debit system of collection unilaterally;

4.      Whether Liberty National acted with scienter when discriminating against Class Members;

5.      Whether Liberty National breached its contracts with Plaintiffs and the Class by changing its administration of its Industrial Policies;

6.      Whether Liberty National routinely failed to disclose to Plaintiffs and Class Members material information about their contracts such as the actual basis on which premiums would be calculated and the likelihood that, during the policyholder's normal life expectancy premium payments would exceed the face value of the Policies or a reasonable amount of total premiums;

7.      Whether Liberty National developed, encouraged and engaged in a scheme designed to sell and administer Industrial Policies through fraudulent concealment of material facts;

25

8.      Whether Liberty National failed to supervise and train its agents who engaged in the schemes described herein and failed to prevent its agents from violating uniformly applicable state insurance laws and regulations;

9.      Whether Liberty National breached its contracts with the Plaintiffs and the Class by refusing or deliberately failing to provide the true amount of life insurance that their premiums would buy under "white" policies;

10.     Whether Liberty National failed to adequately supervise, educate and train its agents regarding the terms of its Policies, appropriate methods of sales presentations, creation of sales materials and information, and compliance with state and federal laws (including state insurance laws and regulations), and whether Liberty National's failure to do so constituted a means by which Liberty National engaged in the schemes described herein;

11.     Whether Liberty National engaged in a nationwide discriminatory course of conduct in targeting the sale of Industrial Life Insurance to an economically disadvantaged and unsophisticated segment of the population and marketed and sold such Policies in a manner to induce the purchase of the Industrial Policies by Plaintiffs and Class Members, and whether Liberty National discriminated against Class Members in establishing premiums for Industrial Policies;

12.     Whether Plaintiffs and Class Members are entitled to specific performance, disgorgement, restitution, increased death benefits, injunctive relief, declaratory relief or other equitable relief against Liberty National;

13.     Whether Plaintiffs and Class Members are entitled to an award of punitive damages against Liberty National;

14.     Whether Liberty National terminated or altered the debit system and failed

26

to provide a premium rebate or reduction, even though the Policies were expense loaded for weekly collection; and

15.     Whether Liberty National's conduct was undertaken with malice or with reckless indifference to the rights of the Class Members to be free from racial discrimination to warrant an award of punitive damages incidental to the equitable relief sought by plaintiffs and Class Members, and the amount of punitive damages which should be awarded to punish Liberty National and deter others from similar conduct.

87.     The claims of the Plaintiffs are typical of the claims of the Class, and Plaintiffs have no interest adverse to the interests of other Class.

88.     Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel experienced and competent in prosecution of insurance class actions and complex litigation.

89.     Liberty National is unwilling to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief.

90.     Most individual Class Members have little ability to prosecute an individual action, due to the complexity of the issues involved in this litigation, the size and scope of Liberty National's uniform sales scheme, the significant costs attendant to litigation on this scale, and the comparatively small, although significant, damages suffered by individual Class Members.

91.     This action will result in an orderly and expeditious administration of Class claims. Economies of time, effort and expense will be fostered and uniformity of decisions will be insured.

92.     This action presents no difficulty that would impede its management by the Court as a class action and a class action is superior to other available methods for the fair and efficient adjudication of their claims.

93.    Plaintiffs seek preliminary and permanent injunctive and equitable relief on behalf of the entire Class, on grounds generally applicable to the entire Class, to require Liberty National to specifically perform the Policies as represented and to disgorge any premium overcharges.

94.    Because plaintiffs and Class Members only recently have learned of Liberty National's discriminatory scheme, and many Class Members remain unaware of Liberty National's wrongful deeds, they did not suffer mental anguish or emotional distress damages, and no such compensatory damages are claimed.

95.    Based upon the intentional and egregious conduct of Liberty National, plaintiffs and Class Members are entitled to an award of punitive damages.  The entitlement to those damages and the appropriate amount of such punitive damages is incidental to the request for equitable relief and flows from the same conduct which entitles plaintiffs and Class Members to equitable relief. Therefore, the award of punitive damages is appropriate under Rule 23(b)(2).

96.    The requirements of Rule 23(b)(3), Federal Rules of Civil Procedure, are also satisfied concerning plaintiffs' punitive damage claim.  The common issues raised by Plaintiffs' punitive damages claim predominate over individual issues.

97.    This action will result in an orderly and expeditious administration of Class claims. Economies of time, effort and expense will be fostered and uniformity of decisions will be insured.

## COUNT I

### (Race Discrimination 42 U.S.C. §1981)

98.    Plaintiffs repeat, reallege, and incorporate herein by reference the paragraphs above as if fully set forth herein.

99.    Defendant intentionally and purposefully discriminated against Plaintiffs and Class

Members by charging them higher premiums than those charged to similarly situated Caucasian policyholders and by prohibiting or specifically instructing their agents to not offer or sell participatory whole life or other reasonably priced policies or products to African-Americans.

100.    By charging higher premiums to African-Americans and refusing to offer participatory whole life or other reasonably priced policies or products to African-Americans, Liberty National violated the rights of Plaintiffs and Class Members to make and enforce contracts on the same terms as Caucasian policyholders.

101.    Defendant's actions violate 42 U.S.C. §1981, as well as the rights of Plaintiffs and the Class under the Fifth, Thirteenth, and Fourteenth Amendments of the Constitution of the United States.

102.    Defendant has damaged Plaintiffs and Class Members because Plaintiffs and the Class have suffered harm as a result Liberty National's illegal racial discrimination.

**COUNT II**

**(Race Discrimination 42 U.S.C. §1982)**

103.    The plaintiffs repeat, reallege, and incorporate by reference the paragraphs above as if fully set forth herein.

104.    Life insurance is personal property within the meaning of 42 U.S.C. §1982.

105.    Liberty National has discriminated against Plaintiffs and the Class with respect to the Industrial Life Insurance they have inherited, purchased, and held.  Plaintiffs and Class Members have not had the same right to inherit, purchase, and hold the insurance sold by defendant.  Liberty National has violated 42 U.S.C. §1982.

106.    Liberty National's violation of 42 U.S.C. §1982 was intentional and malicious.

29

107.    Plaintiffs and the Class have continued to hold Polices within the time period or periods allowed under the Plaintiffs' claims.

108.    As a proximate result of Liberty National's violation of 42 U.S.C. §1982, Plaintiffs and the Class have been harmed.

## COUNT III

### (Breach of Contract)

109.    Plaintiffs repeat, reallege and incorporate herein by reference the paragraphs above.

110.    As a material part of the insurance agreement between Liberty National and Plaintiffs and the Class (either through the express terms of the Policies, applicable statutory provisions or the course of dealing of the parties) from inception of certain policies, premium payments were collected by debit agents for Liberty National on a weekly basis.

111.    Beginning in or about 1995 or 1996, Liberty National Life Insurance Company began and continues to unilaterally dismantle and/or alter the established weekly debit collection system which had been the established method of premium collection since inception of certain Policies, and thereafter required premium payments to be made directly to Liberty National by Plaintiffs and the Class or collected them on a less frequent basis. At the same time, Liberty National continued to demand and collect the same premium paid under the original debit system even though it was no longer providing the same debit collection to the policyholder. In this respect Liberty National collected premiums for coverage which was not provided, or in other words, collected unearned premiums.

112.    By dismantling or altering the established debit premium collection system and thereby unilaterally altering the method of premium collection, Liberty National breached a material

contractual term of its agreement with Plaintiffs. As a result of the breach, Plaintiffs and the Class have suffered harm and are entitled to specific performance. By paying premiums directly rather than through the debit procedure contemplated at the time of contracting, Class Members have lost a bargained-for service with no corresponding decrease in premiums. Plaintiffs have also been forced to incur additional burdens and expenses in making such payments. In addition, Liberty National's discontinuance of the debit premium collection system resulted in the lapse of numerous policies.

113.    Alternatively, Liberty National has been unjustly enriched by continuing to collect expense loads attributable to the weekly debit collection system, even though that system was dismantled. These premium expense loads exceed the expense of the new, less-costly, premium collection systems. Plaintiffs and the Class have suffered an equitable detriment from this wrongful conduct by Liberty National. Therefore, the law implies a debt founded in equity, as it were upon a contract to recover back money, which ought not to be kept by Liberty National as an ill-gotten gain.

## OTHER COUNTS

114.    Solely for the purpose of preserving Plaintiffs' right to appeal the Court's July 3, 2000 Memorandum Opinion and Order on Plaintiffs' motion to alter or amend the judgment of the Court and for leave to file an amended complaint, Plaintiffs reallege and incorporate by reference the following counts and related allegations of plaintiffs' Class Action Complaint, filed December 8, 1999: Count II (Breach of Fiduciary Duty), Count III (Assumpsit on Money Had and Received), Count IV (Declaratory and Injunctive Relief), Count V (Unjust Enrichment and Imposition of a Constructive Trust), Count VI (Improper Hiring, Supervision, Retention, and Failure to Monitor

Actions of Officers and Agents and/or Employees), Count VIII (Fraudulent Inducement), and Count IX (Negligent Misrepresentation).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Liberty National for themselves and Class Members as follows:

1.    An order determining that the action is a proper class action pursuant to Rule 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure;

2.    Granting extraordinary equitable, declaratory and/or injunctive relief as permitted to remedy the effects of Liberty National's racially discriminatory conduct, including a permanent injunction enjoining Liberty National from collecting any discriminatory premiums or paying discriminatory benefits in the future and ordering Liberty National to increase the death benefits, cash values, endowment benefits and non-forfeiture benefits to the level comparable to the benefits paid on policies sold to Caucasians;

3.    Entering an order declaring that Liberty National engaged and continues to engage in a pattern and practice of unlawful discriminatory conduct and declaring the specific pricing, underwriting and policy administration practices of Liberty National to be discriminatory.

4.    Granting equitable relief as permitted by law or equity, including restitution, reformation and attaching, impounding or imposing a constructive trust upon, or otherwise restricting the proceeds of Liberty National's ill-gotten funds to ensure plaintiffs and Class Members have an effective remedy;

5.    Requiring Liberty National to disgorge any premium overcharges, plus interest, and otherwise to reform subject policies in compliance with equity;

6.    Awarding plaintiffs and Class Members punitive damages either as incidental to the equitable relief awarded or appropriate other relief based upon Liberty National's conduct;

7.    Awarding Plaintiffs and the Class punitive damages in an amount to be proven at trial for the wrongful acts complained of;

8.    Awarding Plaintiffs and the Class their costs and disbursements incurred in connection with this action, including reasonable attorneys' fees, expert witness fees and other costs;

9.    Ordering specific performance on the insurance contracts; and

10.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs, on behalf of themselves and all others similarly situated, hereby demand trial by jury on all issues triable at law.

JOE R. WHATLEY, JR.
CHARLENE P. FORD
WHATLEY DRAKE, LLC
2323 Second Avenue North
Birmingham, AL 35203
Telephone: 205/328-9576
205/328-9669 (fax)

34

**OF COUNSEL:**
Herman Watson, Jr.
Rebekah Keith McKinney
WATSON, JIMMERSON, GIVHAN,
   MARTIN & MCKINNEY, P.C.
203 Greene Street
P.O. Box 18368
Huntsville, Alabama 35804
Telephone: (256) 536-7423
Facsimile:  (256) 536-2689


John J. Stoia, Jr.
LERACH, COUGHLIN, STOIA,
   & ROBBINS, LLP
401 B Street, Suite 1700
San Diego, California 92101
Telephone: (619) 231-1058
Facsimile:  (619) 231-7423


Melvyn I. Weiss
MILBERG WEISS BERSHAD
   & SCHULMAN, LLP
One Pennsylvania Plaza
New York, NY 10119-0165
Telephone: (212) 594-5300
Facsimile:  (212) 868-1229


W. Christian Hoyer
Christa L. Collins
JAMES, HOYER, NEWCOMER
   & SMILJANICH, P.A.
One Urban Centre, Suite 550
4830 W. Kennedy Blvd.
Tampa, Florida 33609
Telephone: (813) 286-4100
Facsimile:  (813) 286-4174


Ronald R. Parry
PARRY DEERING FUTSCHER
   & SPARKS, P.S.C.
128 East Second Street
P.O. Box 2618
Covington, Kentucky 41012-2618
Telephone: (859) 291-9000
Facsimile:  (859) 291-9300


Andrew S. Friedman
BONNETT, FAIRBOURN, FRIEDMAN
   & BALINT
2901 N. Central Avenue, Suite 1000
Phoenix, Arizona 85012
Telephone: (602) 274-1100
Facsimile: (602) 274-1199


T. English McCutchen
William E. Hopkins, Jr.
McCUTCHEN, BLANTON, RHODES
   & JOHNSON, L.L.P.
1414 Lady Street
P.O. Drawer 11209
Columbia, South Carolina 29201
Telephone: (803) 799-9791
Facsimile:  (803) 253-6084


J.P. Strom, Jr.
Mario A. Pacella
STROM LAW FIRM. L.L.C.
1501 Main Street, Suite 700
Columbia, South Carolina 29201
Telephone: (803) 252-4800
Facsimile:  (803) 252-4801

# CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon all Attorneys of Record in the above styled cause by placing a copy of the same, properly addressed and postage prepaid, in the United States Mail on this the 30th day of July, 2004.

William J. Baxley, Esquire
William C. Barclift, III, Esquire
BAXLEY, DILLARD, DAUPHIN
    & McKNIGHT
2008 3rd Avenue South
Birmingham, AL 35233
Telephone: (205) 271-1100
Facsimile:  (205) 271-1108

Michael R. Pennington, Esquire
Scott Burnett Smith, Esquire
Anne Marie Seibel, Esquire
BRADLEY, ARANT, ROSE & WHITE
One Federal Place
1819 5th Avenue North
Birmingham, AL 35203-2104
Telephone: (205) 521-8000
Facsimile:  (205) 521-8800

Floyd D. Gaines, Esquire
GAINES LLC
2100 Morris Avenue
P. O. Box 395
Birmingham, Alabama 35201-0395
Telephone: (205) 320-2800
Facsimile:  (205) 320-2811

C. Gibson Vance, Esq.
BEASLEY, ALLEN, CROW,
    METHVIN, PORTIS & MILES, P.C.
218 Commerce Street
Post Office Box 4160
Montgomery, Alabama 36104-4160
Telephone: (334) 269-2343
Facsimile:  (334) 954-7555

Romaine S. Scott, III
Leslie McFall
GARRISON, SCOTT, GAMBLE
    & ROSENTHAL, P.C.
2224 1st Avenue North
Birmingham, Alabama 35203
Telephone: (205) 326-3336
Facsimile:  (205) 326-3332

Kearney Dee Hutsler
KEARNEY DEE HUTSLER, P.C.
2142 Highland Avenue
Birmingham, Alabama 35205
Telephone: (205) 939-6400
Facsimile:  (205) 939-4346

James D. Turner
Brian D. Turner
TURNER & TURNER, P.C.
P.O. Box 2688
Tuscaloosa, Alabama  35403
Telephone: (205) 752-1502
Facsimile:  (205) 345-7229

_____
Of Counsel

36